ROBERT PATRICK STICHT (SBN 138586)
JUDICIAL WATCH, INC.
425 Third Street SW, Suite 800
Washington, D.C. 20024
Telephone: (202) 646-5172
Fax: (202) 646-5199
Email: rsticht@judicialwatch.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF ASHLI BABBITT and AARON BABBITT, individually and on behalf of the ESTATE OF ASHLI BABBITT, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | Case No.  3:24-cv-00033-BAS-DDL <br><br> **DECLARATION OF ROBERT PATRICK STICHT IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE** <br><br> Hearing Date:   April 8, 2024 <br><br> Honorable Cynthia A. Bashant <br> Courtroom 12B (12th Floor) |

I, Robert Patrick Sticht, state:

1.      I am an attorney licensed to practice law in California and am counsel of record for Plaintiffs Estate of Ashli Babbitt and Aaron Babbitt, individually and on behalf of the Estate of Ashli Babbitt.  I am making this declaration in support of Plaintiffs' opposition to Defendant's motion to transfer venue to the District of

Columbia.  I have personal knowledge of the facts contained in this declaration and if called as a witness could, and would, competently testify to those facts.

2. Exhibit 1 to this Declaration is a true and accurate copy of the official transcript of the June 5, 2023 sentencing hearing (Part 1) in the U.S. District Court for the District of Columbia in *United States v. Daniel Goodwyn*, Docket No. 1:21-cr-00153-RBW.

3. Exhibit 2 to this Declaration is a true and accurate copy of the official transcript of the June 6, 2023 sentencing hearing (Part 2) in the same case.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of March, 2024.

*/s/ Robert Patrick Sticht.*
ROBERT PATRICK STICHT

# EXHIBIT 1

1

<pre>
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2

 3     UNITED STATES OF AMERICA,
                                             Criminal Action
 4              Plaintiff,                   No. 1:  21-153

 5          vs.                              Washington, DC
                                             June 5, 2023
 6     DANIEL GOODWYN,
                                             3:04 p.m.
 7              Defendant.
       _____/
 8

 9                        TRANSCRIPT OF SENTENCING
                   BEFORE THE HONORABLE REGGIE B. WALTON
10                    UNITED STATES DISTRICT JUDGE

11
       APPEARANCES:
12
       For the Plaintiff:        ANDREW HAAG
13                               USAO
                                 Criminal Division
14                               601 D Street NW
                                 Washington, DC 20530
15

16     For the Defendant:        Carolyn Stewart
                                 1204 Swilley Road
17                               Plant City, FL 33567

18

19

20

21

22     Court Reporter:           SHERRY LINDSAY
                                 Official Court Reporter
23                               U.S. District & Bankruptcy Courts
                                 333 Constitution Avenue, NW
24                               Room 6710
                                 Washington, DC 20001

25
</pre>

```
 1                    P R O C E E D I N G S
 2          THE COURTROOM DEPUTY:  This is criminal matter
 3    21-153, United States of America versus Daniel Goodwyn.  May I
 4    have counsel and probation approach the lectern and state your
 5    appearance for the record, beginning with the government.
 6          MR. HAAG:  Good afternoon, Your Honor.  Andrew Haag
 7    for the United States.  My colleague Brian Brady will not be
 8    present, so it is just me today.
 9          THE COURT:  Good afternoon.
10          MS. STEWART:  Good afternoon, Your Honor.  Carolyn
11    Stewart here for Daniel Goodwyn.
12          THE COURT:  Good afternoon.
13          MS. REICHLER:  Good afternoon, Your Honor.  Jessica
14    Reichler on behalf of United States Probation Office.
15          THE COURT:  Good afternoon.  Okay.  This matter is
16    here before the Court today for sentencing.  In preparation for
17    the sentencing, I did review again the plea agreement; also the
18    presentence investigation report and also the sentencing
19    recommendation made by the probation department; also the
20    defendant's notice and incorporated objections to the
21    presentence investigation, along with three exhibits that were
22    submitted with that submission; also the government's
23    sentencing memorandum, which was accompanied by eight exhibits;
24    also the defendant's memorandum in aid of sentencing along with
25    24 exhibits, I think there were 23 letters and also a chart
```

1    indicating the sentences that have been imposed in these

2    January 6 cases and other cases; also, again, the criminal

3    complaint that was filed; also the pretrial services agency

4    violation report dated July 27th, 2021; and also an order

5    issued by the Court on March 7th, 2022.

6            Is there anything else that I should have reviewed in

7    preparation for this sentencing, Government counsel?

8            MR. HAAG:  Nothing further, Your Honor.

9            THE COURT:  Defense counsel?

10           MS. STEWART:  Nothing further, Your Honor.  But I

11   have a question besides --

12           THE COURT:  You need to come up here so she can hear

13   you.

14           MS. STEWART:  Beside the presentence investigation

15   report, was there a separate recommendation from probation for

16   sentencing?

17           THE COURT:  Yes.  I did say -- I did indicate I did

18   review --

19           MS. STEWART:  I did not receive that for some reason.

20           THE COURT:  Did you make a request for it?

21           MS. STEWART:  No.  I didn't know I should.

22           THE COURT:  Yeah.  That is generally not provided

23   unless there is a request for it.  But I did indicate that the

24   document had been filed, so if you want to see it, you can see

25   it.

```
1                    MS. STEWART:  All right.  Thank you, Your Honor.

2                    THE COURT:  Do you have a copy for her to read?

3              Do you have a copy for her?

4                    MS. REICHLER:  I just showed her.

5                    THE COURT:  Do you need to read it?

6                    MS. STEWART:  Your Honor, that was fine.  I saw what

7        they recommended.

8                    THE COURT:  Okay.  There were a number of objections

9        that were raised regarding the report.  And, specifically, page

10       2, the release status, and also paragraph 14 of the report that

11       I guess relates to the time that purportedly he was in

12       detention.  Does the government have a position about how long

13       he was in detention?

14                   MR. HAAG:  I defer to the Court and probation, Your

15       Honor.

16                   THE COURT:  Because the defense claims it was 21

17       days.  It seems to me at most it is conceivably 14 days, but I

18       will hear from the defense as to why you believe it is 21 days.

19                   MS. STEWART:  Your Honor, that is based on when he

20       was arrested and the day he was let out.  So it was 21 days

21       from --

22                   THE COURT:  He was arrested on January 29th, 2021.

23       There was a detention hearing on February 12th, 2021.  And it

24       says he was placed on personal recognizance on February 18th.

25                   This indicates the official appearance was on
```

1   February 18th, 2021.  And at that time, he was placed on

2   personal recognizance.  Obviously, there were conditions

3   imposed.

4         Probation, are you sure that he was, in fact,

5   detained from January 29th until February 18th, 2021?

6         MS. REICHLER:  Your Honor, we are relying on the

7   response to the objections on page 28 of the final presentence

8   report.

9         THE COURT:  Okay.

10        MS. REICHLER:  It indicates the defendant had a

11   detention hearing on February 12th in the Eastern District of

12   Texas and was released on personal recognizance on

13   February 18th, 2021 and had initial appearance on March 10th,

14   2021 in the District of Columbia and was released on personal

15   recognizance on March 12th, 2021.

16        THE COURT:  So are your calculations consistent with

17   defense counsel's calculation that he was detained for 21 days?

18        MS. REICHLER:  Let me see.  Hold on a moment.

19        Your Honor, we are in agreement it was 21 days.

20        THE COURT:  Very well.

21        MS. REICHLER:  The US Probation Officer from Des

22   Moines, Iowa was the one who completed the presentence report

23   also.

24        THE COURT:  And the government doesn't take exception

25   with that?

1          MR. HAAG:  No, Your Honor.

2          THE COURT:  Very well.  And the next objection I

3  think was resolved regarding whether the word information

4  should be substituted for indictment.

5          So Defense Counsel, I assume you are satisfied with

6  that change?

7          MS. STEWART:  Yes, Your Honor.

8          THE COURT:  Next, was page 11 regarding his prior

9  history and whether he has a prior reportable conviction.  As I

10 understand, he entered or at least nolo contendere plea was

11 entered on his behalf in that case.  And probation

12 represents -- and it would appear to be the case -- that a nolo

13 contendere under the guidelines is, in fact, counted.  Although

14 in the context of this case, it wouldn't make any difference

15 regarding what his guideline sentence is.

16         But, Defense Counsel, what is your position as to why

17 the probation officer's contention about that nolo contendere

18 being counted and why that is incorrect?

19         MS. STEWART:  Yes, Your Honor.  So on document ECF

20 102.1, that was our objection.  We included the order from the

21 judge.  He never entered -- and it was also in the other

22 exhibits.  In this particular type of prosecutorial deferment,

23 he signs a plea, but it is never entered.  And the documents

24 that we entered within 102.1 show that the Court only took nolo

25 contendere under advisement.  It was never entered.  As a part

1   of a prosecutorial deferment, it is a silver bullet.  It is one

2   time.  You get put on a period of observation and if you are

3   good, then it is dismissed.  So the charge was dismissed.  And

4   the exhibit we provided shows, as signed by the state judge,

5   that the count is terminated as defendant completed what we

6   will call terms of probation.  That was an observation

7   probation.  It was not a sentence.  And this order constitutes

8   a dismissal of all proceedings against the defendant without

9   any adjudication of guilt and is not a conviction for any

10  purpose.

11          And as I wrote a memo to the prosecution, this is

12  different than the cases where 4A1 that they refer to allow

13  someone on a deferred sentencing.  In those cases, the person

14  goes to trial or they actually plead in open court and it is

15  accepted, whereas Mr. Goodwyn's plea was never accepted.  He

16  never pled anything but not guilty in this type of process he

17  was part of.  In the processes where the defendant pleads

18  guilty or is convicted, there is another deferment before

19  sentencing.  And in that type of deferment, they go through a

20  probationary period also.  And then they don't get sentenced.

21          The way the people or the -- those who do the US

22  sentencing guidelines looked at it -- and this is well noted --

23  if you were convicted in a proceeding, then this is just

24  desserts, it should count.  But in the process that Mr. Goodwyn

25  was in, it never got to proceeding.  The proceeding is

1  suspended.  We go for 6 months, a year, however long they

2  determine and then everything is dismissed.  It never is -- so

3  in that 102, the proceedings were suspended.  The judge said, I

4  will take this under advisement, but there never was an entry

5  of guilty or nolo contendere plea.  And this is a -- it is a

6  state law.  And many states have this, such as Texas, my

7  college deferred adjudication.  We are not going to trial, we

8  are not going to do any of that.

9       And if you go through this -- and it is felonies in

10  Texas, that could go for 10 years.  But that is what happened

11  here, Your Honor.  So it should not count as a point.  And

12  under USSG 4A1.2(f), it is very clear, deferred prosecution is

13  never to be counted.  The -- what happens if the prosecution

14  went to 4A1.2(c) and said, oh, look, this looks like

15  trespassing, it is similar to being on the Capitol grounds, you

16  should count it.  You never get to what the prosecution did

17  with 4A1.2(c) because F says you never count deferred

18  prosecution.  Does that answer your question, Your Honor?

19       THE COURT:  Well, I am looking at the documentation.

20  And the order -- it says order suspending proceedings,

21  nonetheless does have nolo contendere circled as to Count 1,

22  which was the trespassing count.  And it also indicates

23  defendant plea of nolo contendere is hereby under advisement.

24       MS. STEWART:  Right.  It never was entered as a plea.

25  It was just taken -- that is how they do it in Wyoming.  They

1  never enter it.  The plea that remained, if he had gone to

2  trial, Your Honor, would have been not guilty.  That was the

3  only plea on the record.

4        THE COURT:  What is probation's position on this?

5        MS. REICHLER:  Your Honor, we're relying on the

6  response from the USPO from Iowa who did the presentence report

7  on page 28.

8        THE COURT:  On what, 28 you said?

9        MS. REICHLER:  Yes, of the final.  Pursuant to USSG

10  4A1.2(f), it states that diversionary disposition resulting

11  from a finding or admission of guilt or a plea of nolo

12  contendere in a judicial proceeding is counted as a sentence

13  under 4A1.1(c) even if a conviction is not formally entered,

14  except that diversion from juvenile court is not counted.  The

15  defendant pled nolo contendere to criminal trespass and was

16  sentenced to a 1-year term of probation.  This offense is

17  considered a criminal conviction for purposes of the

18  defendant's criminal history calculation, regardless of whether

19  the state court documents reflect that it is not a conviction.

20        For the above reason, the report remains unchanged

21  and the objection is noted for the record.

22        THE COURT:  Okay.  Well, there appears, like I say,

23  to have been a plea of nolo contendere entered on his behalf.

24  And I think the defense position is set forth as to why the

25  defense believes that it should not count.  I would not

1    disagree with probation that it does count, especially in light

2    of the fact that it really doesn't make any difference in

3    reference to what the guideline sentence is, because it only

4    results in 1 point and accordingly would not impact on what the

5    guideline sentence is.  So over objection, I will not require

6    that that be altered.

7          Okay.  The next matter is regarding the defendant's

8    compliance with the conditions of pretrial release.  And I

9    distinctly remember when we had the issue regarding him not

10    wearing a mask and the Pretrial Services Agency having a

11    problem with that.  It seems to me the appropriate thing to do

12    in this regard is to add language indicating that Pretrial

13    Services records reflect the defendant has not complied with

14    all court-ordered conditions and release, but add, but he has

15    been in full compliance for the past 22 months.  And then

16    indicate the defendant's noncompliance involved, one, the

17    arguing -- I guess, the noncompliance was the fact he would not

18    wear the mask.  So I would require that the report indicate

19    that he has been in full compliance with the conditions of

20    pretrial release for the past 21 months even though he was

21    initially in noncompliance.  Anything else on that?  If not,

22    we'll move on then.

23          Okay.  Next was paragraph 33.  And that relates to

24    paragraph 33, which indicates information regarding a victim

25    impact and there is no human victim that he is accused of

```
1    having victimized, but there is a claim that there was damage
2    done to the Capitol.  Admittedly, he did not do any damage as
3    far as we know.  But there was damage done, so what is the
4    defense position as to why that paragraph 33 should be altered
5    or deleted?
6              MS. STEWART:  Your Honor, the defense's reading of
7    3663 and 3663(a) is that it requires a human.  So it wasn't
8    discussed in the plea agreement.  We are not going to do back
9    flips over this, but it is just in our reading of the statute
10   that the probation office added.  And I understand they have
11   that duty to provide you with a statute by which you can charge
12   restitution.  So we just read the statute as requiring a human
13   victim.
14             THE COURT:  Well, again, I would not require that
15   paragraph be changed.  The paragraph does not suggest there was
16   a human victim and only reflects the fact that there was damage
17   done on that day and what the amount of damage was, even though
18   it doesn't indicate Mr. Goodwyn had anything to do personally
19   with that and does agree he agreed to pay $500 in restitution.
20   So over objection, I would not require that be altered.
21             Okay.  The next -- what is the next objection,
22   Defense Counsel?
23             MS. STEWART:  I have to look at my -- one second to
24   look at my memorandum, Your Honor.
25             THE COURT:  It is paragraph 11 and 48.  Okay.  Next
```

```
 1   argument.

 2            MS. STEWART:  That one, Your Honor, if we are at

 3   48 -- on 11 that goes back to the same thing as having added a

 4   point here, which you have already ruled on.

 5            THE COURT:  Very well.  And I would not require that

 6   there be a change in reference to that particular paragraph.

 7            What is the next objection?  It looks like we are at

 8   paragraph 52; is that right?

 9            MS. STEWART:  Your Honor, two things.  So one is

10   the -- item 55 was a typographical error.  It is not --

11            THE COURT:  Paragraph 55 or item 55?

12            MS. STEWART:  I'm sorry.  Item 55.

13            THE COURT:  I agree, that should be changed.  That is

14   a typographical error.  So that should be changed consistent

15   with your position, I agree with that.

16            MS. STEWART:  And then the next one is -- in the next

17   paragraph or two, I am looking at my objections.  And I should

18   have put this in here.  But where he objected to the report

19   using the criminal complaint language that he is a

20   self-proclaimed member of the Proud Boys, which he never has

21   been and never did.  We just don't know how that got into the

22   complaint.  But it was not included in the statement of the

23   offense, because both the prosecution and I agreed that there

24   was no evidence of that.

25            THE COURT:  That is true.  I don't know how it got
```

1    into the complaint, but it is in the complaint.

2           MS. STEWART:  Yes.

3           THE COURT:  Government have any position in reference

4    to whether that should remain in the report?

5           MR. HAAG:  Briefly, Your Honor.  I am honestly not

6    quite sure how that made it into the criminal complaint.  There

7    are references in the evidence of the defendant engaging with

8    Proud Boys, but I don't think that needs to be referenced as

9    being within the criminal complaint.

10          THE COURT:  Very well.  I will order that be omitted

11    from the report.

12          Next matter.

13          MS. STEWART:  I believe that was the last one, Your

14    Honor.

15          THE COURT:  Very well.  With those changes and the

16    objections that I ruled on, the report remains unchanged.  The

17    only change will be the two matters I indicated.

18          If there is not anything else regarding the accuracy

19    of the information contained in the report or the guideline

20    calculations, I will hear from government counsel by way of

21    allocution.

22          MR. HAAG:  Thank you, Your Honor.  To reiterate the

23    government's recommendation in this case is that the Court

24    sentence Mr. Goodwyn to 90 days incarceration, 12 months of

25    supervised release.  There was a typo on the memorandum, not

1  36.  It should be 12 months, $500 of restitution and then as of

2  today that fundraiser that was referenced in the sentencing

3  memorandum.  It is now up to $26,026.  So the fine request

4  would be that amount.  The reason for that recommendation, in

5  this case is a variety of reasons.  There are three primary

6  characteristics of this case that I think warrant a sentence

7  such as that.

8          The first is the offense itself.  Next is the

9  defendant's criminal history.  And finally the lack of remorse

10  that the defendant has for this case.

11          Starting first with the offense.  On January 6,

12  before Mr. Goodwyn went into the senate wing door, he stood

13  outside using a bullhorn where he incited rioters.  And I am

14  going to play a portion of the video that shows that now.

15          THE COURTROOM DEPUTY:  If you could wait one moment.

16  It is not coming up on the screen just yet.

17          MR. HAAG:  I just plugged it in.

18          THE COURT:  It will take a minute before it

19  activates.

20          MR. HAAG:  I am also using a speaker on the

21  countertop if there are any issues.

22          (Video played.)

23          MR. HAAG:  Just for the Court's reference,

24  Mr. Goodwyn is standing with the bullhorn.

25          THE COURT:  All right.

1              (Video played.)

2              MR. HAAG:  So, Your Honor, what we saw in the clip

3    here was Mr. Goodwyn using that bullhorn.  He makes multiple

4    references to the fact that he needs men to go inside, points.

5    Behind him at that point is the senate wing door.  He is seen

6    saying that he needs critical mass for this to work.  Based on

7    the statements here, it seems that Mr. Goodwyn has some

8    semblance of a plan, some objective that he is trying to do and

9    that he needs additional people in order to make that work.

10   That is why he is using the bullhorn to make it spread

11   throughout the crowd to make sure as many people can hear it as

12   possible, rather than just an errant yell in the middle of the

13   crowd, maybe riling people that way.  Here, he is using a

14   bullhorn to really make sure he is heard.

15              And the next factor of the case is Mr. Goodwyn's

16   entry into the Capitol.  And I am going to pull up the

17   surveillance footage, which is Government Exhibit 2.

18              Jumping forward 20 seconds.  And as Your Honor is

19   aware, there is no audio for this.

20              (Video played.)

21              MR. HAAG:  So circling for the Court, you have

22   Mr. Goodwyn here in the red hat just in the middle of the

23   screen where he is currently looking at a police officer.  Now

24   what happened at this point is Mr. Goodwyn walked in with a red

25   hat and sunglasses.  The officer reached out and touched

1    Mr. Goodwyn.  Mr. Goodwyn turned and looked directly at the

2    officer.  As you will see in a moment, Mr. Goodwyn does not

3    interact with this officer and keeps moving into the Capitol.

4          (Video played.)

5          MR. HAAG:  So, Your Honor, this there shows

6    Mr. Goodwyn's trip inside the Capitol is relatively short, but

7    there are some points that I'd like to highlight for Your

8    Honor.  First is that when Mr. Goodwyn saw that officer, again

9    looking directly at the officer, he continued straight into the

10   senate wing door.  He kind of slipped by some other rioters as

11   he was making his way through until he ran directly into the

12   line of police officers that is on the left-hand side of the

13   screen there.  At that point, those officers grabbed him,

14   notified him that he needs to leave.  And Mr. Goodwyn appears

15   to make some kind of recognition of that.

16         At that point, he turns around, sees the same police

17   officer that tried to stop him at the front of the room and he

18   dodges around the officer to the officer's right.  And goes

19   around some other officers to the some other rioters to their

20   left and then eventually stops and talks to another rioter.

21   And I am going to pull up the video for that conversation now.

22         MS. STEWART:  Objection to the next video, Your

23   Honor, because it does not include Mr. Goodwyn.  Unless I

24   received the wrong video.  It is just a video of some other

25   people that -- Anthime Gionet also known as Baked Alaska was

1   videoing.  And Mr. Goodwyn had no interaction with the people

2   in this video.

3          MR. HAAG:  Your Honor, this video does show

4   Mr. Goodwyn.  He is about 2 minutes and 40 seconds in.  You

5   will see him walk through the lobby area.

6          THE COURT:  Very well.  As the government is

7   representing he is depicted in the video.  I will overrule the

8   objection.

9          MR. HAAG:  Jumping forward to 2 minutes and 40

10  seconds.

11         MS. STEWART:  Again, Your Honor, I'd like to object

12  because this is just highly prejudicial showing other people's

13  potential violence that Mr. Goodwyn was not with.

14         THE COURT:  The government has jumped ahead to

15  another section.  Obviously, I won't consider what doesn't

16  depict him on the screen, so I won't consider that.

17         MS. STEWART:  Okay.

18         MR. HAAG:  Playing now from 2:40.

19         (Video played.)

20         MR. HAAG:  So, Your Honor, circling in the middle of

21  the screen here, pausing at 2 minutes and 49 seconds is

22  Mr. Goodwyn wearing the red hat with sunglasses.  You could

23  hear just a moment ago towards the left was someone saying hey

24  multiple times.  I believe that is a police officer trying to

25  get Mr. Goodwyn's attention after the officer had just reached

1    out in the middle of the screen, here is that one officer that

2    we saw on the surveillance video.

3            THE COURT:  Is this another version of what was

4    previously shown, just from a different perspective?

5            MR. HAAG:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. HAAG:  So the surveillance video kind of shows

8    pointing towards the window, this is pointing away from the

9    windows at the same time.

10           MS. STEWART:  Objection, Your Honor.  We did -- a

11   video available that was -- this is from Baked Alaska.  And

12   before talking with Mr. Brady, the previous AUSA, he is still

13   on the case, but unfortunately not here due to a family

14   tragedy.  What we determined -- Mr. Goodwyn did professional

15   tools on this.  And there is no way to isolate that that police

16   officer's voice said anything at that point to -- we did

17   multiple takes, a lot of work, sent the frequency charts to

18   Mr. Brady.  So I question any authenticity here to claim that

19   hey there was said by the police officer.  We did frequency

20   isolations for voices and could not isolate his.

21           THE COURT:  The prior video did clearly show this

22   officer directing his attention towards Mr. Goodwyn.

23   Obviously, if I can't discern what was said, the government can

24   run it back and I will see if can discern what was, obviously,

25   being said.  Obviously, if I can't, I won't consider that.

1          MS. STEWART:  Thank you, Your Honor.  It was loud in

2     there.  There are a lot of people talking, so now we are just

3     hearing video from the person who stopped him on the way out.

4     So thank you, Your Honor.

5          THE COURT:  Very well.  The government can replay it

6     again.

7          (Video played.)

8          THE COURT:  It sounded to me like he said, "hey,

9     hey," and then he is indicating the defendant should come to

10    him, so I heard him saying, "hey, hey."

11         Very well.

12         MR. HAAG:  And, Your Honor, I do believe that the

13    video speaks for itself at that point.  The other thing I want

14    draw to Your Honor's attention is the noise in the background

15    of the video.  There is the audible alarm that has been --

16    testimony in these cases has shown was playing the whole day.

17    And here in the video, you can hear a very loud, piercing

18    alarm.

19         THE COURT:  I wasn't focusing on that.  Can you play

20    it again?  I was focusing on whether I could hear what the

21    officer was saying.

22         (Video played.)

23         THE COURT:  I can hear it.

24         MR. HAAG:  So there is the high-pitched noise,

25    another indication that Mr. Goodwyn should not have been in the

1    senate wing door and had plenty of knowledge that he should not

2    have been there.  At this point, I am just going to keep

3    playing at 3:15.  At this point Your Honor is going to see on

4    the back end of the interaction that we saw on the surveillance

5    video where he stops for a moment by the exit to the Capitol.

6              (Video played.)

7              MR. HAAG:  So there was a lot that happened in that

8    clip there.  You could see the back end of where Mr. Goodwyn is

9    exiting the Capitol, but then stops to interact with a man

10   whose pseudonym is Baked Alaska, Mr. Gionet who has also been

11   charged in these cases.  Mr. Goodwyn stops, has a conversation

12   with Mr. Gionet, identifies himself.  And then when prompted,

13   Mr. Goodwyn turns back towards the officer that has been trying

14   to get him out of the senate wing door and calls him an oath

15   breaker and that Mr. Gionet should take his badge number down.

16             So while Mr. Goodwyn was only in the Capitol for just

17   under a minute, there is a lot to this offense that is more

18   than just walking into the Capitol and walking out.  There is

19   the information going on outside with the bullhorn, as well as

20   a lot of evasive conduct and insulting conduct that Mr. Goodwyn

21   made towards the officers in this case.

22             Turning next, Your Honor, to Mr. Goodwyn's criminal

23   history.  As we were discussing earlier was the trespass case

24   in Wyoming.  That case occurred on Mr. Goodwyn's drive from

25   California to Washington, DC on January 6th.  On that day, he

1    was stopped in Wyoming.  He was stopped for trespass and

2    interfering with a police officer, which was failing to provide

3    his identification.  That occurred on January 2nd.  And the

4    court records show that the arraignment happened on

5    January 4th, so just two days before January 6th.  So

6    presumably at that point, he went from Wyoming on January 4th,

7    made quite a quick trip across the country to Washington, DC

8    where he committed the offense in this case.  And where he was

9    released in Wyoming, I don't have the court records for this.

10   I'd assume he was likely on conditions of release to not commit

11   a new offense.  So he goes from getting arraigned in Wyoming

12   and then committing the offense in this case.

13           So I think despite the fact that the charges in the

14   Wyoming case are relatively minor, I think it highlights the

15   risk of recidivism for Mr. Goodwyn in this case.  The fact he

16   was such a short amount of time between Wyoming and DC

17   committing two offenses is something noteworthy.  And I think

18   the Court should take it into consideration when reviewing this

19   case.

20           MS. STEWART:  If I may object, Your Honor.  I will

21   state there was no adjudication of guilt.  A charge that was

22   dismissed with prejudice is what prosecution is talking about.

23   Mr. Goodwyn chose not to go to trial.  Had I been his attorney,

24   I would say go to trial, get this all thrown out.  But he used

25   his silver bullet.  It is not counting here for a criminal

1    history point.  But what I am saying is he was not convicted of

2    that.  There is an allegation because he walked in a Taco Bell

3    and got into an argument with someone about not wearing his

4    mask.

5           So the recidivism is perhaps related to the fact that

6    due to his Asperger's, he doesn't like to wear masks.  And you

7    are aware of that.  That is what we talked about, his

8    noncompliance.  But I object to this being called a trespass

9    that he was convicted of and that he did it.  No, he did not.

10   Thank you, Your Honor.

11          THE COURT:  Well, I think it should reflect that

12   there was no nolo contendere, although you say it wasn't

13   actually accepted, the record does reflect that there was a

14   nolo contendere plea entered at that time.  So that is what the

15   record reflects and that is what I will rely upon.  I won't

16   consider it a conviction, but it was a nolo no plea that was

17   entered.

18          MR. HAAG:  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. HAAG:  I think I am having a little issue with

21   the computer.

22          Your Honor, while this loads up, the next point is,

23   the lack of acceptance of responsibility that Mr. Goodwyn has

24   in this case.  That stems from an interview that Mr. Goodwyn

25   gave about 6 weeks to 7 weeks after he pled guilty before Your

1    Honor at the end of January.  The context of that is that after

2    that plea, Mr. Goodwyn went on to "Tucker Carlson Tonight" on

3    Fox News channel where he gave an interview where he discussed

4    both his conduct on January 6th as well as his experience

5    having been charged for his conduct.  And I am going to pull

6    that up.  That is Government Exhibit 4.

7          (Video played.)

8          MR. HAAG:  And I am going to jump forward to 1:08.

9          So there are two points of that interview segment I

10   want to highlight for Your Honor.  First is the minimization of

11   conduct that Mr. Goodwyn did there.  There is an opportunity

12   where Mr. Carlson describes Mr. Goodwyn's conduct as walking in

13   and out of the Capitol.  And Mr. Goodwyn confirms that is all

14   he did.  He ignored the fact that he was outside with the

15   bullhorn inciting people to go in.  He ignored the fact that he

16   ignored police commands to leave the Capitol and ignored the

17   fact he didn't comply with the commands after he received them.

18   And second was the last portion of the clip where he

19   characterizes himself a political hostage.

20         MS. STEWART:  Objection, Your Honor.  And I am going

21   to go to, I think, relevance and also truth of the matter.

22   Mr. Goodwyn didn't run the show.  He was asked some questions.

23   It was a 3- or 4-minute segment.  So it wasn't his show to

24   start talking about everything else.  But he referred to the

25   statement of the offense.  He said it is in my papers, whatever

1    I did.  So I object to adding embellishment or saying that he

2    could control -- and demand another 3 or 4, 5 minutes to speak

3    on that show.

4            THE COURT:  Well, I don't think there is any basis to

5    object.  I mean, Mr. Goodwyn could have come clean and

6    indicated exactly what he did when Tucker Carlson was

7    minimizing the extent of what he did.  Because he did more than

8    what Tucker Carlson indicated.  And he didn't say anything to

9    correct that.

10           MS. STEWART:  Your Honor, he did what is in the

11   statement of the offense.  And, again, to say he was outside

12   with the bullhorn, that wasn't a question.  Because Tucker

13   Carlson didn't have video of that.

14           THE COURT:  But Tucker Carlson indicated a version of

15   what purportedly occurred, which was inconsistent with what

16   your client did and your client didn't correct it.  And I think

17   that is a significant problem because the misinformation and

18   the propaganda that is sometimes put out by, you know, people

19   in the media, gets people all riled up and causes some of the

20   problems that we are experiencing in our country.  And your

21   client could have corrected exactly what occurred.  Because he

22   did more than what Tucker Carlson indicated.  So people who may

23   be sympathetic to what occurred on January 6 hear what is

24   taking place here and feel the government somehow has treated

25   your client unfairly, based upon what Tucker Carlson, you know,

1    incorrectly indicated your client had done.

2          So I hear your objection.  That is noted for the

3    record.

4          MR. HAAG:  So, Your Honor, we are turning to the

5    political hostage language.  What that is doing is Mr. Goodwyn

6    is characterizing himself as the victim of the January 6th, not

7    the officers that were defending the Capitol, not the lawmakers

8    and their staff that were either cowering in the house gallery

9    or had to evacuate from the building because of the rioters in

10   the building.  Mr. Goodwyn sees himself as the victim on

11   January 6th.  And describing himself as a political hostage I

12   think is very emblematic of that.

13         And the salience of that idea that he is the victim

14   becomes very clear towards the end of the video where he

15   pitched his fundraiser that I referenced in my memo.  So I am

16   jumping to 3:44 of the video where that portion comes up.

17         (Video played.)

18         MR. HAAG:  So what just happened here, Your Honor, is

19   the defendant was responding to a question of how people

20   could -- how the viewers of the show could help January 6

21   defendants like Mr. Goodwyn.  And that is when he referenced

22   this website called StopHate.com/J6.  And if Your Honor follows

23   that URL, it takes you to a page of a list of fundraisers where

24   there is a long list of defendants, over 100 January 6

25   defendants that are listed there where people can click on

1    their image and donate to them.  However, the list isn't in any

2    particular alphabetical order.  It is just an assortment of

3    names familiar with January 6.  Mr. Goodwyn's name is listed as

4    the first on that.

5         So while during the segment, there was no indication

6    as to he was soliciting funds for himself.  The fact that he is

7    directing people to a page where he is listed as the number 1

8    defendant, it makes it very clear that the defendant during the

9    segment was soliciting contributions, soliciting donations for

10   himself.

11        Now, in his filing Mr. Goodwyn asserts that all of

12   the money that he has received, the over $26,000 that he has

13   received as part of the fundraiser is strictly for legal fees

14   and that he has no ownership over that money.  But that just

15   isn't the case, watching the interview itself, Mr. Goodwyn is

16   making a point that the money goes directly to the defendants.

17   And he is, in fact, one of those defendants.  And it is also

18   consistent with prior fundraisers that Mr. Goodwyn has put

19   forward in his life.

20        I briefly mention this on page 5 of my sentencing

21   memorandum that there was a fundraiser for Mr. Goodwyn where he

22   said, help fund my travel from California to Washington, DC.

23   But there is an important part of that.  And I am going to pull

24   up the image here.  Now, this image is that Give Send Go page

25   that I was just referencing here.  At the bottom here there is

 1    a link.  It is a Give Send Go/GVM9.  If Your Honor follows that

 2    link, that link takes you to another fundraiser posted by

 3    Mr. Goodwyn.  That is his website here.  And at the top, it

 4    says arrested for not wearing a mask on bus in San Francisco.

 5    And he provides some facts to describe what happened.

 6            MS. STEWART:  Objection, Your Honor, relevance.

 7    Again, this has nothing to do with January 6.

 8            THE COURT:  Overruled.

 9            MR. HAAG:  What it shows here is that the defendant

10    was arrested on September 15 of 2020.  These three infractions

11    here are just references to the penal code here.  One of them,

12    the last one here, section 148 is the penal code for

13    interference with a law enforcement officer.  And then at the

14    end, this is the most salient part of this is hopefully this

15    fundraiser can help me with things such as legal fees, activism

16    and my daily life in San Francisco.  So what this shows here is

17    the defendant's state of mind is how he views these

18    fundraisers.  Is they are not something that are strictly for

19    legal fees.  It is something to fund the way he wants to live

20    his life, the way he wants to fund his activism, the way he

21    wants to fund his daily life back home in San Francisco.  The

22    idea of funding his activism is reiterated by the fact if you

23    scroll down, Your Honor, you see the same update of the image

24    that I showed you earlier is the update of him using the

25    fundraiser to solicit dotations to make the drive from

 1   California to Washington, DC to go to the January 6 rally.  So
 2   that point, I think is very important to put together, one, the
 3   defendant's idea of victimhood and then using these fundraisers
 4   to describe himself as the victim and then using them as a
 5   means to solicit contributions.  And turning back to the
 6   donations he received following the Tucker Carlson, he did, in
 7   fact, receive those donations.  Looking at the website, he
 8   followed the link all of the way through.  You click on his
 9   picture on the one website cited in the memo and it takes you
10   to this wall.  And this kind of lists a lot of the donations.
11   It is not all of the donations.  It lists a number of the
12   donations given to Mr. Goodwyn.  And you can see here --

13           MS. STEWART:  Objection, Your Honor, these are -- he
14   is putting facts that are not in evidence.  And there is no
15   foundation for this.  Those -- Mr. Goodwyn has no title to this
16   money.  This money goes through a third party.  So when he is
17   saying Mr. Goodwyn got this, he hasn't gotten anything.  Thank
18   you.

19           THE COURT:  That may be true, but it seems like the
20   contributions were made in response to his call for them to be
21   made.  So whether he used them or not or got them or not, it
22   seems to me, that it is relevant to show that he did, in fact,
23   solicit funds.  Overruled.

24           MR. HAAG:  So, Your Honor, you'll see in the middle
25   of the screen here, it is dated March 15th, 2023.  And this is

1    just immediately after the interview that Mr. Goodwyn gave.
2    And you will see a number of these donations, four just here on
3    the 15th and then a fifth one on the 16th and then another one
4    about a week and a half after that.  You can see that his
5    attempt to again treat himself as the victim and use that as a
6    means to solicit contributions worked.  He received donations
7    immediately following that interview.  So it shows that his
8    idea and his frame of mind going into that interview was that
9    he was trying to solicit contributions and it, in fact, worked.
10           Your Honor, I would note that the request for the
11   $26,000 fine is outside of the guideline range in this case,
12   which tops out at $9,500.  However, I draw the Court's
13   attention to section 5E1.2 note 4, which allows the Court to
14   impose a higher than guideline sentence if there is a need to
15   effectuate appropriate discouragement of moneys generated as a
16   result of criminal activity.  And that is exactly what is
17   happening in this case.
18           MS. STEWART:  Objection, Your Honor.  Objection.
19   This isn't money coming from drug operations.  This is charity.
20   This is not money coming from illegal activity.  It is charity,
21   so that statute doesn't apply.
22           THE COURT:  Well, again, I don't think someone can
23   engage in criminal behavior, admit they engaged in that
24   criminal behavior and then solicit funds in reference to that
25   criminal behavior.  I mean, so I think it is totally

 1    appropriate for the government to make the arguments that it is

 2    making.  What was the provision again?

 3              MR. HAAG:  That was section 5E1.2 and then note 4.

 4    And, Your Honor, I do want to be clear that this -- the request

 5    for the fine in this case is for the maximum amount.  And the

 6    reason why it is for the maximum amount is it is really unclear

 7    whether or not the defendant is using any of this money for

 8    legal fees.

 9              THE COURT:  You said commentary what?

10              MR. HAAG:  Note 4.

11              MS. STEWART:  Again objection, Your Honor.  When the

12    prosecution says, it is unclear if he is using money for the

13    legal fees, the probation office doing the investigation report

14    spent quite a bit of time and Mr. Goodwyn showed him a ton of

15    receipts and where money went to his former attorneys -- every

16    penny -- and to other people who loaned money to him.  So I

17    don't know why we would be standing up here when the probation

18    officer said he has no money.  He did a detailed financial --

19    there is no money in savings accounts.  The money didn't go to

20    buy anything else.  He accounted for every single penny that he

21    earned.  He is in debt.  As matter of fact, it said in our

22    sentencing memo -- and I don't know why the government wouldn't

23    read that, he is in debt still for 75- or $80,000, so they want

24    him to repay --

25              THE COURT:  You can make those points when you

1    allocute, but I won't prohibit the government from making the

2    argument it is making.  Overruled.

3             MR. HAAG:  So, Your Honor, with respect to

4    Mr. Goodwyn's expenses, I draw the Court's attention to section

5    98 of the presentence report.  It is on page 18.  In that it

6    discusses Mr. Goodwyn's expenses.  It notes there is a monthly

7    income from StopHate.com.  I understand that is where he works.

8    I don't know if that is related to the fundraiser at all.  But

9    it does note there is an income of $750.  Assuming that the

10   money coming in from the fundraiser is this StopHate.com, it is

11   saying that he has $750 a month coming in from that.  And then

12   you go down towards the end of the page which indicates other

13   expenses and legal fees of $500.  So that is a $250 gap.

14   Again, this is the situation where there is not enough

15   information to conclude that the defendant is actually using

16   all of the money he is getting from StopHate.com for his legal

17   expenses.  In fact, the presentence report says there is this

18   $250 gap, which I think is indicative that there is --

19   Mr. Goodwyn is using not for legal fees in this case.  And

20   because there is a lack of clarity, that is why the government

21   is asking for the full $26,000.

22             And then lastly, Your Honor, there are a few

23   comparison cases that I cited in my sentencing memorandum that

24   I think would we helpful for the Court to look at.  But the one

25   I really want to draw the Court's attention to is United States

1    versus William Tyrone, which was a case that Your Honor

2    handled.  In that case, the defendant had ample knowledge,

3    shouldn't have been inside the Capitol.  Police officer said he

4    used chemical irritant and struck him with a baton.  He

5    nonetheless went inside.  After coming outside, he went on top

6    of a car and started encouraging rioters there.  Also spoke to

7    a journalist and compared the rioters to the people that

8    stormed the beaches in Normandy, the soldiers that stormed the

9    beaches in Normandy.  And I think the comparison there of

10   rioters to soldiers kind of echos Mr. Goodwyn's

11   characterization of himself as a victim.  It kind of elevates

12   the stature of who the rioters were on January 6, which they

13   claim they were not.  In that case, the Court sentenced

14   Mr. Tyrone to 50 days incarceration as well as a $2,000 fine I

15   believe it was.  But this case I think warrants a higher

16   punishment, both because of the lack of acceptance of

17   responsibility on behalf of Mr. Goodwyn and this kind of string

18   of arrests for not complying with a law enforcement officer.

19   You go from taking Mr. Goodwyn on his word that he was arrested

20   for interfering with a police officer in San Francisco then

21   going to Wyoming, being released two days before January 6 and

22   going to Washington, DC to commit the offense in this case, I

23   think does warrant a significant uptick in punishment from what

24   was seen in the Tyrone matter.

25            MS. STEWART:  Objection, Your Honor.

1          THE COURT:  Overruled.

2          MR. HAAG:  If the Court has no further questions.

3          THE COURT:  Thank you.

4          Defense.

5          MS. STEWART:  Are you able to plug in there?

6          MR. HAAG:  Yes.

7          MS. STEWART:  Since he already has the video

8     accepted, we'll look at it in a minute.  Your Honor, first I'd

9     like to start with I think acquainting people to the human

10    being that Mr. Goodwyn is.  He is a very good person.  He has a

11    good family.  He holds Christian values.  He upholds those

12    values.  And we'll put January 6th over here because that is an

13    anomaly.  He has got a loving family, many who are present here

14    today in support.  He has got loving friends.  He could have

15    gotten 100 letters, but he attached some 26-odd letters to the

16    memorandum that we put in for the defense.

17          I am dismayed by the government's presentation,

18    because they absolutely refused to go and -- I don't know if

19    that is because Mr. Brady had his family tragedy, there was no

20    turnover.  We went through extensive negotiations for the plea

21    that Mr. Goodwyn pled guilty to.  And he has pled guilty to

22    that.  He has accepted responsibility for that.  He has great

23    remorse.

24          He does not like the harm that came to the United

25    States.  He doesn't like the violence that injured police.  He

1   doesn't like the violence where some protesters died.  All

2   around, it was not a good day.  And it is not something that he

3   has ever considered himself to be a victim of.

4          When we look at what the government wants here, they

5   want you to take away money that he received in charity.  So I

6   will stand here and tell you, I have no idea what his previous

7   lawyers charged him for.  But $110,000 approximately was paid

8   up front.  They haven't returned a cent.  I have been doing

9   everything since September 30th.  I didn't charge him $110,000.

10  He doesn't need to fundraise for me.  But what I am saying is,

11  he has only been able to pay back because other people loaned

12  him money.  He has only been able to pay back out of his

13  savings.  He still owes $75,000.  And the probation officer

14  knew that.  I went through some of these things too.  We were

15  on the phone for hours.  So there is no question here.

16  Mr. Goodwyn has not enriched himself.

17         And, yes, whether you look at it that way or I look

18  at it that way, but he and his family have suffered.  They have

19  suffered where their friends who don't talk to him anymore.  He

20  has suffered where he hasn't been able to go back to San

21  Francisco where he considers home.  He has been in home

22  confinement for over a year.  He has been in third-party

23  custody since the day he was released, so now 27 months,

24  however long he has been in third-party custody.  This has not

25  been a good time.  He hasn't been able to expand his business.

1    And we had COVID on top of that.  Again, with home confinement,

2    very limited.

3         But I am dismayed because, I understand Mr. Brady's

4    tragedy, but there weren't a good turnover of all of those

5    discussions we had.  Mr. Goodwyn has high functioning autism.

6    And he has Asperger's.  So what he says and how he speaks may

7    not be how neurotypical people would speak, what is in their

8    mind and how they see things.  A lot of what he does is on a

9    perception and it is on learned activities.

10        So if we can look at the video outside with the

11   bullhorn.  And, again, I have worked with someone who has a

12   degree in, you know, nuclear physics and made it through the

13   Naval Academy.  And nobody ever caught that he had Asperger's

14   until he was working in an environment.  So I am familiar with

15   that and having gone through with doctors to get him diagnosed

16   as a Navy officer.  And in here, part of that is some people

17   with Asperger's don't know their kind of place, like, what is

18   their situation, who is listening to him of what import.

19        But I want to start by saying that the basis for this

20   plea agreement started because the government heretofore would

21   not remove the 1512 obstruction until we proved we had an

22   affirmative defense.  I want to start off where the government

23   says he went and he had a plan.  No, that is absolutely an

24   embellishment.  And with Mr. Brady, we showed him we had an

25   affirmative defense.  And 1512 was going to come off the table.

1    And that is where we moved to this being on restricted grounds.

2    But being outside on the restricted grounds -- and, again, when

3    you are dealing with somebody with autism, truth and facts,

4    that is how this plea agreement was arrived at, the statement

5    of the offense.  That is why stuff like the Proud Boys came

6    out.  Okay.  He put a meme up.  Everybody was joking.  As a

7    matter of fact, people were using that meme to make fun of the

8    president.  Stand back and stand by, Proud Boys.  It was a

9    joke.  But he did that.  Factual things are in the statement of

10   the offense.  But the embellishment was taken out.  The I think

11   he did this and I think he meant that was taken out.  Because

12   when you are dealing with somebody with autism, everything is

13   black and white.  It is a fact.  It is this way or it is not.

14        So when he walked on the grounds and there were no

15   signs, people are praying, they are milling about.  He walks up

16   steps.  He is on a terrace, taking some pictures out over the

17   the crowd.  He didn't see violence.  He didn't see a single act

18   of violence.  He is on that terrace and people are milling

19   about.  So as we first look toward the back of this picture,

20   Your Honor -- and you'll see, there is a whole boatload of

21   cops.  And even over in the very left, in the very back, there

22   is one US Capitol Police and also you had Metropolitan PD show

23   up.  And they are all there watching.  What does an autist

24   need?  They need a signal, somebody to come over and tell you,

25   get out, you can't be here.  He sees everybody else and he

 1    says -- and that is part of the thing with autism, what you see

 2    and what you learn that are socially acceptable.  Here is

 3    everybody.  Nobody is committing any violence, which I

 4    understand the term riot is thrown around.  Maybe by definition

 5    by US statute it requires violence.  There is no riot here.

 6    You just -- right at this still shot, people are standing

 7    around talking.  Nobody is assaulting a police officer.  This

 8    is what comes into his eyes and his ears when he is there.  I

 9    can be here.  I can be -- there is nothing that says, I can't

10    be here.

11          Now, maybe I, as a retired military officer, would

12    know, I shouldn't be here.  I wouldn't have gone there.  I

13    don't see any reason I would have ever gone there.  But

14    thousands and thousands of people thought they could be

15    somewhere.  And in his area, they were not violent.  Nowhere in

16    this lifetime would Mr. Goodwyn ever condone any violence

17    toward law enforcement.  It is not happening.  He is not --

18          THE COURT:  How do you explain what happened in the

19    Capitol itself?  I mean, it seemed clear to me that the officer

20    was having discussions with your client.  And the officer's

21    conduct would clearly suggest that he was saying to your client

22    he could not come into the building and was trying to get him

23    to leave the building.  And your client was defiant, at least

24    for a short period of time, in response to that.  So he was

25    given -- he was, it seems to me, given a signal that he was not

1    permitted to enter and was not permitted to be there and he

2    didn't abide by that.

3            MS. STEWART:  Your Honor, can we move to that video?

4    Because I -- the point I make here is he yelled on the

5    bullhorn.  You have that.  If you look through it again, not a

6    single person listened to him, not a person moved toward the

7    door.  The door was behind him.

8            THE COURT:  I am not talking about that.  I am

9    talking about this where it appears the officer is speaking to

10   him --

11           MS. STEWART:  Right.  So now here -- we can stop

12   here.  This is the point -- and we went over and over this with

13   Mr. Brady in determining the plea deal.  And this is where

14   Mr. Goodwyn admits guilt, this is.  He did not -- the police

15   officer is standing against the wall.  If you will note, there

16   is people behind him.  There is Baked Alaska.  There is all

17   kind of people here.  They are allowed to be here.  So

18   Mr. Goodwyn is trying to come in.  The doors were open.  The

19   cops outside were standing there.  Nobody yelled, don't go in.

20           He does not -- again, first, the alarm didn't

21   register, just as when you or I or anybody else first hears

22   that, if there is other sound in video with sound, you don't

23   hear that steady tone.  It doesn't sound like an alarm.  It is

24   by all safety regulations not recommended to use a tone like

25   that if you are trying to use it for a fire alarm, because

1    somebody would sleep though that.  It is a steady tone, just

2    like white noise.  It can become white noise.

3            So if you will progress with the video, please.  As

4    looks -- if we can stop -- he felt something brush him and he

5    turned.  Something brushed him and he turned.  But he didn't

6    know what it was.  He doesn't see a hat.  So you see a head.

7    There are people around.  There is a head.  I would say that

8    the point where someone said, hey you, hey you, is later.  It

9    was not right here.  The timing if you overlap the timing of

10   that Baked Alaska video with this, that hey you, hey you timing

11   does not come up here.

12           And if you will progress, please.  So Mr. Goodwyn --

13   all right.  If you we stop.  He is -- there is also crowd

14   behavior.  But there is also someone who doesn't want to get

15   pressed against and doesn't want to get a whole bunch of

16   strangers touching them.  All right.  He moves to an open space

17   and he stops.  There is not, he ran into a brick wall of cops.

18   He actually stops.  There is other people as you look at the

19   screen from your view, over his right shoulder but it is left

20   on the screen.  There is not cops yelling and screaming.  They

21   had formed a cordon.  Mr. Goodwyn in seeing this says, I was

22   wrong.  At that point, there is a cordoned -- and I have

23   notice, I had knowledge, I should not be there.  I should not

24   be there.

25           Now, the police officer is way to his right still.

1   And he runs over to get to him.  So if you'll proceed, please.

2   Now we see him grabbed.  So he grabs him.  So if you will stop

3   please and tells him to get out.  And Mr. Goodwyn starts to

4   leave.  It is after this point that the hey you, hey you comes

5   in.  And it is after this point -- and, again, that was Baked

6   Alaska's video.  That was his livestream in that other video

7   the prosecution showed.  And you hear the hey you, hey you.  I

8   don't know.  Because when we had that up and we talked with

9   Mr. Brady, we were looking at the back of the officer's head in

10  that video.  So I can't see if his lips were moving.  He had

11  already told him to get out.  Nobody is arguing with that, Your

12  Honor.  He was already told to get out.  But he stopped and he

13  talked to Baked Alaska.  And that is where he disobeyed the

14  police.  When the policeman said to get out, he turned, he was

15  grabbed.  And, yes, that -- again to somebody with autism and a

16  grabbing, there is a little bit of difference in how the mind

17  can react and how the mouth can react.  So he felt he had not

18  harmed anybody, done anything.  Other people are being allowed

19  to stay in.  What were his words?  His words were, "Oath

20  breaker, get his badge number."

21          Now, you could look and say, who would say something

22  like that?  I'm sorry.  Somebody with autism would.  And

23  because in his mind, he would perceive that other people around

24  him see the same thing.  That officer grabbed him rudely.  He

25  hadn't done anything.  Nobody else was being grabbed and pushed

1    around, just him.  But he also has Baked Alaska --

2         THE COURT:  For whatever reason, the officer clearly

3    at the door had focused his attention on your client.

4         MS. STEWART:  He did.

5         THE COURT:  And considering the officer's conduct

6    after your client entered, it is clear to me that the officer

7    was saying, you can't be here.  And he didn't listen.

8         MS. STEWART:  Yes, Your Honor.  On the way out.  He

9    did not hear him on the way in.  He did not.

10        But when he stopped, when we showed where he stopped,

11   and the officer came up and told him, he got it.  I am getting

12   out.  I am wrong.  He stopped and talked to Baked Alaska.  He

13   should not have done that either.

14        So he was in there where he shouldn't be and he

15   stopped, because he was being taunted or whatever.  By this

16   livestreaming guy who by the way, the police were letting stay

17   inside and livestream.  I am just explaining from the video and

18   the view of Mr. Goodwyn, he didn't go in and say, I am dissing

19   the cops.  That is not what he did.  There is a crowd.  He is

20   trying to get to an open space, stop, see where he is, what is

21   going on.  And then the cop comes over.  He knows he is wrong

22   now.  I should go out.  He is not denying that, Your Honor.

23   That is --

24        THE COURT:  If he knew he was wrong, then why does he

25   then turn to the officer and call him an oath breaker?

1          MS. STEWART:  He did that by the door.  And I think

2     you -- I am asking you to understand Asperger's and autism.

3     Because in his mind, he was in there to support the process.

4     He had no conspiracy or plan to go stop anything.  He was there

5     to use his speech, go guys, go, investigate.  I would like to

6     see you object and have an investigation.  He is the last

7     person who got anything good out of January 6th in that regard.

8     Because everything stopped and nobody wanted to investigate

9     anymore.

10          That was all lost.  So --

11          THE COURT:  But then, he appears on Tucker Carlson's

12     show, if you are saying what he understood was wrong, he sure

13     didn't give that projection when he was on Tucker Carlson's

14     show.  He was clearly saying he was a political prisoner.

15          MS. STEWART:  He called everybody political hostages.

16     And that went to the thought of the thousands, if not

17     million -- but at least for January 6ers that the FBI has now

18     labeled domestic terrorists.  And that is a whole different

19     argument.  We are not bringing it here.  But that was the

20     prosecution cut it off, but that was part of the discussion.

21     Mr. Goodwyn may have had a longer time slot.  And it is just

22     ironic.  It is not funny.  But for the show that night, one of

23     the producer coordinators sent him to the wrong studio.  So we

24     were supposed to be on at 8:15 to 8:20 something.  But because

25     they sent him, they gave somebody else a longer time.  So the

1    slot ended up being about 8:40.  It was shorter.  So he didn't

2    get to speak.  He answered the questions.  He didn't get to go,

3    but, you know, I stood outside with a bullhorn that -- we

4    already provided that to the producers.  They had all of that.

5    So he didn't get anymore time, Your Honor.  If you watch the

6    whole thing, it is like all right, what can we do to help?  And

7    he was not speaking to himself.  He said, you can go to

8    StopHate.com, which does not take you to a page with a list of

9    people to donate to.  It takes you to a page of videos, it

10   takes you to a page where you can go pray.  It has a whole

11   bunch of other things.  You have to click on a donate.  So

12   StopHate.com doesn't open up with January 6 donations.  That is

13   an incorrect presentation.

14        And he sincerely wanted people to pray and to ask

15   them to support people who have been in jail for over two years

16   and yet to have a trial.  So that is something he was talking

17   about.

18        THE COURT:  If he doesn't understand that what took

19   place on that day was one of the worst days in America, that is

20   very troubling.  I mean, I think as a country, we are in

21   trouble because if when people lose an election and they don't

22   admit it and they get followers who will then do what happened

23   on this day, we are in trouble as a country.  We are in real

24   trouble.  Because what -- next time if the democrats lose and

25   they will at some point, they take the same position and all of

1    a sudden, we have anarchy in America.

2          MS. STEWART:  Well, Your Honor, nobody is saying it

3    was a good day or not a terrible day.

4          THE COURT:  It was a horrible day.  It is one of the

5    worst things I have ever seen happen in our country.

6          MS. STEWART:  I won't say I agree with that, because

7    I have seen other bad things happen in our country.

8          THE COURT:  I said one of the worst.  I didn't say it

9    was the only worst.  That was a bad day for American democracy.

10          MS. STEWART:  All right.  And Mr. Goodwyn really,

11    Your Honor, is with you on that.  And whether he is able to --

12    and, again, I am going to point you to autism and Asperger's,

13    because the way he may express things is different than you or

14    I or somebody else sitting over here.

15          THE COURT:  That is why he should have never gone on

16    the Tucker Carlson show.  I don't understand why people do

17    that.  I haven't seen anything good come out of people who are

18    charged with criminal offenses, especially once they have

19    already pled guilty going on a television show and basically

20    minimizing the extent of their conduct.

21          MS. STEWART:  He had no intent to minimize.  Again, I

22    will take Your Honor back to 3 or 4 minutes.  Part of it is

23    taken up by Tucker.  It is not even Mr. Goodwyn speaking.  Part

24    of it -- I mention that there needs to be some focus and

25    investigation on the use of resources for calling all

1    January 6ers domestic terrorists and whether our tax dollars

2    should be going there.  But in his portion, he had no intent to

3    minimize anything.  He was -- Tucker Carlson got the video.  He

4    was -- he went through other parties to contact Mr. Goodwyn.

5    But the question was from Tucker to go on the show is what

6    could he do to help people.  So that is an enticement to go on.

7    And I don't think it should be so bad looking at a reference to

8    StopHate.com, because it is not all about giving to January

9    6ers.  That is not even all of what StopHate.com is about.  So

10   it is its own thing.  Mr. Goodwyn does work for that.

11           I would say that the fund and this request for a fine

12   is rather outrageous, because I am not aware that fundraising

13   whether he does it in San Francisco to collect money to go on

14   the trollies.  People put in -- first of all, no January 6ers

15   are allowed to go on Go Fund Me.  They are already banned.  You

16   can't get there from here.  So there is Give Send Go or there

17   is Donor Box.  There is some other fund sites and fund

18   processes.  But I don't think Mr. Goodwyn can go do a Go Fund

19   Me, because I am not sure he could have even have a Stripe

20   account to get the payments.  They do not go to him from the

21   donors.  They go through a third party, which they gather up

22   every several weeks and they send to him.

23           And I guarantee you, they are going for him to pay

24   back people who donated to pay his other lawyers.  And as I

25   said, January 6 has created a legal industry.  And there is a

1   lot of money being required by these lawyers.  He is –– he

2   is –– he paid out over 110K, so he has no savings.  He has no

3   money.  Why would we want to make him a pauper.  Is he supposed

4   to go in bankruptcy?  There is no money.  The probation officer

5   went into all of the accounts.  And whether he has now an extra

6   $200 a month, but his income varies, he has still got 75- or

7   $76,000 he owes people.  There are people who might have, I

8   would just say, mortgaged their homes to support him.  So this

9   isn't –– this isn't like this money is going anywhere else but

10  there.  And then he has still got a lifetime and however long

11  it takes him as he feels obligated to repay those monies.  He

12  is not going to declare bankruptcy.  But I don't see why we

13  would want to fine him when the probation officer reports that

14  he has no money.

15          And I would go back to, he believed he could be

16  there.  And I take that with, again, what he saw as signs.  He

17  learns by signs and cues, where he can be, where he shouldn't

18  be and he didn't see any until he got in the building.  He is

19  wrong.  He admits it, Your Honor.  He is remorseful.

20          THE COURT:  I don't see how he couldn't have seen.

21  He was looking in the direction of these hoards of police

22  officers that clearly were there for some reason.  And that

23  didn't deter him from moving forward.

24          MS. STEWART:  And again, Your Honor, we showed you

25  earlier outside the picture, there is police officers standing

1    directly opposite that entry door just standing against the

2    building looking.  I am saying, would I think there is

3    something?  There is no police outside of those 50 or 100

4    officers walking up and telling people, don't go in that door.

5    I don't know why they weren't saying, get off the terrace at

6    that point.  They were just there.  I don't know what they were

7    there for.  They were not telling anybody to leave.  So that is

8    the input.  That is the sensory input he had.  I can't speak to

9    what happened anywhere else on the grounds at this point today.

10         Nobody outside listened to him on the megaphone.  But

11   his call was to support the process.  So that is a very

12   different thing than saying he had a plan to do something to

13   obstruct.  And, again, Mr. Brady and the government didn't even

14   consider continuing with the 1512 charge because of his

15   affirmative defense and people who would have stood up and said

16   that is why he was there.

17         I think there cannot be an overemphasis on learned

18   rules and signals for somebody with autism and they are high

19   functioning.  He goes to therapy.  This is a lifelong thing.

20   There is no cure, Your Honor.  Again, we see the police

21   standing by on the video.  That is what he says.  That is what

22   he saw.  This is a -- it is level 4 for the misdemeanor.  We --

23   I don't want to compare him to people who were fighting in the

24   tunnel.  He didn't see that.  He was not on his phone.  He is

25   not aware of violence anywhere.  He didn't go into the crypt.

1   He didn't go into the rotunda.  He wasn't in an engagement with

2   Officer Dunn or Goodman or any of the folks that have

3   engagements or testified in other trials.  He hasn't enriched

4   himself.  He doesn't speak like you or I might.  So should he

5   have been on Tucker?  He wanted to go help, because that is

6   what Tucker asked to talk about.  How can we help January 6ers?

7   Now, Tucker had this footage.  And we were very honest.  We

8   didn't say, oh, my gosh, we didn't have that, you found

9   something new.  We told him that in the beginning, that we had

10  that footage.  He did not discover something that had not been

11  given to us.  This wasn't like the presentation on Jacob

12  Chansely where there were some discoveries.

13          He has lost his residence in San Francisco.  He lost

14  his job there.  He is not working with his ministry.  He has a

15  decreased income.  He has no savings.  He owes 75- or $76,000.

16  He admits he is guilty and he is remorseful.  And I would say

17  another thing about people with Asperger's is their facial

18  expressions might not match.  There is things -- I wasn't an

19  attorney at the time, but I found some of the doctor's things

20  that I presume were presented to you somewhere around July of

21  2021 when he was first -- with the mask issues.  Yes.  A mask

22  can be very sensitive to somebody with Asperger's.  It -- chew

23  through the mask or whatever is going to happen.  That is a

24  particular thing.  It is a disability, Your Honor.  It is not a

25  mental illness.  He is a very smart man.  It is not a mental

1   illness.  This is a disability.

2           And when you take the totality of the circumstances

3   and what he saw -- so, again, you are saying, he went on

4   Tucker -- the prosecution themselves said, well, he didn't do

5   anything to overturn his plea.  Well, let's -- again, we look

6   at what he pled to.  He said, yes, I was on the bullhorn.  He

7   didn't get a chance to say that on Tucker.  But the question

8   was --

9           THE COURT:  He did have a chance.  I mean, Tucker

10  said to him, Is that all you did?  And he said, yes.  So he was

11  suggesting or indicating to the public that Tucker Carlson was

12  speaking to that all he did was go into the Capitol for a

13  minute or so and leave.  And he left it at that.  And, you

14  know, obviously, the objective of that was to make it seem like

15  people on that day are being treated unfairly by the government

16  because they really didn't do anything.

17          MS. STEWART:  Your Honor, I don't think he said they

18  didn't really do anything.  But, again, Tucker's question --

19          THE COURT:  That is what Tucker Carlson was trying to

20  suggest, he didn't do anything of significance that would

21  justify him being prosecuted.

22          MS. STEWART:  I think, again, their view of the crime

23  and the charges, that is up for people to debate.  Should it be

24  a trespassing fine?  What should it be?  We are going hard and

25  heavy with the federal statutes here, trying to get people in

1    jail and in prison.  That is different than other cases that

2    have been handled in the past.  We can go back years.  That is

3    not our argument here today though.

4         We are talking about somebody who was nonviolent.

5    And Tucker didn't just say, well, is there anything else?  He

6    said, did you?  He jumped in.  So now Mr. Goodwyn is answering

7    the full question by Tucker, did you break anything?  Did you

8    do anything violent?  Did you assault police?  And he says, no,

9    what I did is in my documents.  This -- they received the

10   statement of the offense, Your Honor.  So at that point, Your

11   Honor --

12        THE COURT:  To be candid, which is why he never

13   should have gone on that show.

14        MS. STEWART:  Well, that is a matter of time.  Again,

15   it was a poor situation.  Because if the person hadn't screwed

16   up and he had been on the original time, there had been a

17   couple more minutes and there had been time to say, wait a

18   minute, let's talk about he was on the bullhorn or this.  But

19   it got so compressed that Tucker got to the main point of

20   having him on to begin with, what can people do to help?  And

21   his answer wasn't say, oh, point at me and give me money.  He

22   is not going to turn it down.  I told you.  He owes 76,000 or

23   some-odd dollars.  He has no money.  He is broke.  The man is

24   broke.

25        So I also want to say here that January 6 was a bad

1    day, because we are talking about the United States Capitol.

2    We are talking about where our government does business as far

3    as the legislative.  And the prosecution is comparing

4    Mr. Goodwyn arguing about wearing a mask in a Taco Bell in

5    Wyoming where the person got offended and called the police,

6    with going inside the US Capitol and the charge of section

7    1752.  To people who thought January 6 was a bad day, that is

8    offensive.  Somebody went into a Taco Bell and argued with --

9    wait a minute.  There is not a sign on the door.  Why are you

10   kicking me out?  And, again, that is learned behavior.  He

11   left.  He left.  But then the cops came and he wanted to see

12   the law.  And the other guy then went and dragged him out of

13   the car and said, we are arresting you for trespassing now on

14   the parking lot.  So we don't know what that was.  I don't want

15   to talk about Wyoming.  We have been over that here multiple

16   times today.

17          So he is very remorseful.  January 6 was a bad day.

18   But he took the signs based on his disability, Your Honor.  And

19   he messed up on the way out by stopping.  And those terms,

20   because of his disability, were agreed to with Mr. Brady as

21   prosecutor and not a lot of embellishment and supposition.

22          Subject to your questions, Your Honor.

23          THE COURT:  Thank you.  Anything your client would

24   like to say?

25          THE DEFENDANT:  Thank you for the opportunity to

1   speak, Your Honor.  Firstly, I'd like to express my sincere

2   remorse for my actions.  My regret includes the negative impact

3   they have had on the community, my family, friends, the

4   government and the Court.

5          I appreciate dismissal of the inappropriate section

6   1512(c)(2) obstruction charge which carries a 20-year maximum

7   sentence and that the prosecution intimidatingly tried to get

8   me to plead guilty to.  Because my intent always was to support

9   the constitutional and statutory process of counting and when

10   used -- the debate over objections.  It was difficult to be

11   charged with a crime that was opposite of my acts and intent.

12   I accept full responsibility for entering and remaining in

13   restricted building or grounds in violation of 18 USC section

14   1752(a)(1) and would like to reiterate to the Court that I

15   affirm the statement of offense, ECF 83 and I am ready to face

16   the appropriate consequences.

17          Your Honor, I'm sorry and apologize for violating the

18   law.  I understand the broader impact of my actions and have a

19   genuine desire to make amends and contribute positive to the

20   society moving forward.  I have learned my lesson from this.

21   And from now on, I will be extra careful to look for an

22   official door with metal detectors before I ever enter in a

23   federal building.  Texas has added a communication impediment

24   banner at the bottom of my driver's license.  And I believe

25   this along with counseling and training by my autism specialist

1    will help me to avoid conflict with any future law enforcement

2    interactions and help me to continue to learn how to

3    de-escalate misunderstandings in the future.  I will be

4    especially cautious before going along with massive crowds.

5            While I take full responsibility for entering and

6    remaining in a restricted building for less than one minute,

7    I'd like to humbly offer some mitigating factors for your

8    thoughtful consideration.  First, I humbly submit that I

9    believe it should weigh in my favor that my delay in leaving

10   was shorter than any other known January 6 defendant,

11   particularly considering those who have pleaded to this

12   particular charge.  This displays a level of respect for law

13   and order and law enforcement.  While it is not illegal to

14   raise one's voice, I agree it was inappropriate for me to shout

15   after the officer told me to exit, where I saw others were

16   being allowed to remain inside.  However, I did exit within

17   that same minute.

18           Actions speak louder than words.  I don't think it

19   would be fair to evaluate this conduct without viewing it

20   through a lens taking my autism into account.  I am on the

21   autism spectrum.  Autism is a development disorder that affects

22   social interaction, communication and behavior.  I have faced

23   difficulties over the years, including with social

24   interactions, sensory sensitivities and communication barriers.

25   Autistic people often see things very black and white and

1   sometimes get stubborn or have outbursts that are unexpected

2   and not socially normative.  The disability has impacted my

3   ability to navigate daily activities, such as work, education,

4   relationships and personal responsibilities.  Throughout my

5   life, adjustments and accommodations have been made to cope

6   with challenges associated with it.  Because I think and act

7   differently than neurotypical people, at times I can feel very

8   isolated and alone and different than society at large.  And

9   due to frequent misunderstandings, which are usually minor, I

10  have a deep longing to be known and understood by others.

11      I am very extroverted which means I get recharged by

12  being around people and drained while being alone.  During over

13  a year of home confinement relating to this case, I felt very

14  isolated.  And recently I made efforts to seek treatment,

15  therapy and support services to address the challenges

16  associated with autism.  Therapy sessions and participation in

17  support groups have helped me cope with the disability.  I plan

18  to continue taking steps to improve my quality of life and

19  contribute positively to society, despite the disability.

20      In an effort to be compliant, I had my defense

21  attorney arrange with the government for me to self report.

22  However, before the appointed time to arrive, the FBI-led

23  counterterrorism task force conducted a dramatic, predawn

24  military SWAT team raid, which was very traumatic for me and my

25  family.  Additionally, being incarcerated for 21 days in Fannin

County Jail and over a year of home confinement, was also very traumatic, especially in light of my disability.

Prior to January 6, I was let go from a job where I was making a reasonable income, which resulted in me living paycheck to paycheck based on the cost of living in San Francisco, even with occasional donations from my support base. While I am grateful for the employment that I have now and even had before January 6, it hasn't covered enough for me to be able to finish off paying the crushing legal fees for my previous defense attorney yet. About a quarter of the amount has been raised by people who love and support me, whether strangers, friends or family. Yet the prosecution seeks to have me fined for that amount, even though that money has already gone towards those legal fees. And I virtually have no money to my name right now. Funds going to legal defense can hardly be considered opportunistically profiting off my criminal conduct.

For one thing, I am defending myself against a charge that was dropped, the 1512. So some of the money could have been considered going to that and not to this one. I am still making regular payments out of my own money to pay off the remainder of that legal cost. Being subjected to restrictions stemming from my release conditions, combined with the lies about me in the media, I have been able to pursue a more lucrative career path in tech, which I have a degree in and

1   have extensive skills and experience with.  Due to my name

2   being dragged through the mud, I will have to expend extra

3   effort and funds to instill trust in my potential clientele,

4   even though my crime did not involve dishonesty, I carry the

5   stigma.

6           Being in limbo since my arrest, has caused me to put

7   my life on hold.  I would have liked to have gotten married and

8   started a family by now.  And this has delayed that.  All of my

9   life, I have been a law-abiding citizen with no criminal

10  history record, devout Christian, churchgoer and ministry

11  volunteer.  I have dedicated my life to prayer, worship and

12  church unity in San Francisco as well as missions across the

13  United States and abroad.  This includes speaking the truth,

14  working with a servant heart, preaching the gospel, helping the

15  poor and being an active member of my community.  I pray that

16  the letters written to Your Honor show that despite some issues

17  caused by my autism, I am known in my family, churches and

18  communities as a wholesome man.

19          In my plea agreement, I agreed to allow law

20  enforcement agents to conduct an interview of me regarding the

21  events in and around January 6, 2021 prior to sentencing, ECF

22  82.  I have fully complied with my long list of release

23  conditions.  I have agreed to pay restitution to the Architect

24  of the Capitol in the amount of $500.

25          I have been having counseling sessions with my autism

1    specialist every month and I'd like to continue those, which I

2    won't be able to do if I am incarcerated.  I request that you

3    please allow me to become involved in the community in San

4    Francisco again as soon as possible so I can contribute to

5    society as a productive citizen.

6         No matter what happens, I give all glory, honor,

7    power and praise to the Lord, Jesus Christ, who was and is and

8    who is to come.  Every knee will bow and every tongue will

9    confess.  Amen.

10         THE COURT:  When you say that lies have been

11   perpetrated against you in the media, what are you talking

12   about?  What lies are you referencing?

13         THE DEFENDANT:  Well, Your Honor, people, for

14   example, have said that I am a Proud Boy when I am not a Proud

15   Boys.

16         THE COURT:  Other than that?

17         THE DEFENDANT:  That is one of the main ones.  And,

18   for example, they might assume I am guilty of the other charges

19   which I am not pleading to.

20         THE COURT:  You are saying that when you were on the

21   bullhorn looking in the direction of a large number of police

22   officers, who clearly had formed a line that was in my view

23   indicating that people were not permitted to go past that

24   location, you are saying that you didn't realize that going

25   past those officers was somehow going to be wrong and you are

1    calling out for people to go in and accomplish whatever I guess

2    your objective was in coming to Washington?

3          THE DEFENDANT:  Your Honor, to clarify, like if the

4    door is here, the police were here.  So the police were not

5    obstructing the door.  So it appeared to me as the people

6    meandering in and out from both directions and throughout the

7    crowd, they weren't even doing crowd control or traffic control

8    outside the building.  When I went inside the building then saw

9    the cordon, then you could see that there was an attempt to be

10   made for traffic control.  So outside, there was not that

11   impression, Your Honor.

12         THE COURT:  Well —

13         THE DEFENDANT:  I'd be happy to look at the video

14   again — probably not the protocol, but I could show you —

15   point to the police or whatever.

16         THE COURT:  Well, I am going to have to think about

17   overnight what I am going to do, because I am conflicted as to

18   what the appropriate thing to do is in your case.  Because, I

19   mean, I am not an expert when it comes to autism or Asperger's

20   syndrome.  But it concerns me what you did here both when you

21   are on the bullhorn calling for people to enter the Capitol —

22   it is hard for me to understand why you didn't appreciate that

23   that was wrong.  And from the video, it sure appears to me that

24   that officer was directing his attention to you and telling you

25   that you were not permitted to enter.  And his conduct that he

 1   engaged in once you enter is totally consistent with that

 2   inference for me to draw as to what he was saying to you.

 3   Because as soon as you went past him, he went after you, which

 4   would indicate that he was telling you, you could not enter.

 5   And then you sought to avoid him.  And then when he confronted

 6   you again and, obviously, was saying something to you that you

 7   didn't like, you called him an oath breaker.

 8           And, you know, the police officers -- you say you are

 9   not anti-police and I hope that is the case.  But, you know, to

10   suggest that the only people who died that day were Trump

11   supporters that is just not true.

12           THE DEFENDANT:  There were no --

13           THE COURT:  There were at least three or four police

14   officers who committed suicide.

15           THE DEFENDANT:  That wasn't on January 6th.  I am

16   referring to the date specifically.  I'm sorry if it is just my

17   autism that parses things very specifically.

18           THE COURT:  I don't understand what you are --

19           THE DEFENDANT:  So those people didn't die on

20   January 6, they died later.  I actually don't think that they

21   died because of January 6th.

22           THE COURT:  But you didn't think -- you reference

23   those people, but you didn't seem to have any sympathy for

24   police officers who died.  You didn't seem -- there was one

25   officer who died of a heart attack as a result of what took

1    place.  And there were three or four --

2           THE DEFENDANT:  It was not as a result of what took

3    place.

4           THE COURT:  Excuse me?

5           THE DEFENDANT:  It actually was not as a result of

6    what took place, if you look at --

7           THE COURT:  I understand.  But you didn't seem to

8    care about those officers.

9           THE DEFENDANT:  I do care.

10          THE COURT:  You didn't seem to care about those

11   officers and what happened that day to them, that is my point.

12          THE DEFENDANT:  Yes, sir, Your Honor.  I do care.

13          THE COURT:  I think it is unfortunate anybody died in

14   reference to what took place on that day.

15          THE DEFENDANT:  So --

16          THE COURT:  But you didn't seem to care about those

17   officers, you cared about the people who were engaging in

18   inappropriate behavior.

19          THE DEFENDANT:  I don't believe the people who were

20   killed died because of their inappropriate behavior.  And I

21   don't -- I didn't witness any of the police violence either.

22          THE COURT:  You really don't have any remorse about

23   what happened that day.  You seem to --

24          THE DEFENDANT:  Ashli Babbitt did nothing wrong.

25   Rosanne Boyland did nothing wrong.  Kenneth Grayson did --

```
 1              THE COURT:  You are digging a hole for yourself.

 2              THE DEFENDANT:  -- nothing wrong.  Benjamin Phillips

 3    did nothing wrong.

 4              THE COURT:  You are digging a hole for yourself.

 5    Keep on digging.

 6              THE DEFENDANT:  Your Honor, I respect you.  I don't

 7    mean to be disrespectful.

 8              THE COURT:  No.  He is digging a hole for himself.

 9    It is showing me, contrary to what was indicated in the report,

10    he really doesn't have remorse about what happened that day.

11              MS. STEWART:  Your Honor, I, again, want to bring up

12    a point to you about autism and specifics -- so Mr. Goodwyn

13    answers very specific questions.  He does -- he has said

14    multiple times -- I don't know how to get it across to you

15    because he is trying to tell you here that he is very

16    remorseful that any police were injured.

17              THE DEFENDANT:  I am, yes.

18              MS. STEWART:  He prays for them.  He prays for their

19    families.  He -- his disagreement and believe that was at his

20    plea hearing was because four protesters actually were killed

21    by police and any police who died, died subsequent to January 6

22    starting with Brian Sicknick.

23              THE COURT:  Four protestors were killed that day by

24    the police?

25              MS. STEWART:  Yes.
```

1          THE DEFENDANT:  Yes, I just named them.

2          THE COURT:  I know of one.

3          MS. STEWART:  Ashli -- we can name them.  They are on

4     StopHate.com.  But two of them were hit in the chest or torso

5     or nearby and caused immediate heart attacks on site, Your

6     Honor.

7          THE COURT:  I don't think -- I mean, I understand

8     people who feel that what happened that day was all right.

9     They feel consistent with what you are indicating.  But, you

10    know, the police were protecting the Capitol.

11         MS. STEWART:  Yes, Your Honor --

12         THE COURT:  And they were overrun by individuals who

13    were trying to subvert our governmental process.  And he

14    doesn't seem to understand that.

15         MS. STEWART:  Well, Your Honor, first of all, on

16    January 6, Mr. Goodwyn witnessed no violence, where he was,

17    where he went.  He didn't see it until afterwards.  And he

18    prayed.  He prayed for everybody.  He did not like anything as

19    it turned out on January 6th.  He is telling you, he is

20    remorseful.  So I want to say that.  For the people where he

21    saw videos afterwards who died, they were back in the crowd.

22    They weren't up front engaged with police.  This is a different

23    issue.  It is not where he was.  But when he says protesters

24    were killed, I have seen the videos and I concur.

25         But that is not for us.  That is for Congress to

```
 1    investigate and I tried to get across in the sentencing memo

 2    and ask you not to take against him that he feels remorse for

 3    those.  Ashli Babbitt was shot by a police officer.

 4              THE COURT:  When she was coming through a window in

 5    close proximity where congressional members.  And this man who

 6    was protecting the Capitol ends up being called a thug by the

 7    former President of the United States.  That is -- that is just

 8    mind boggling.

 9              THE DEFENDANT:  He didn't warn her.

10              MS. STEWART:  So, again, the Capitol Police cleared

11    him.  He didn't warn her.  He picked up a gun, he shot her.  He

12    shot her in the neck.  She is dead.  I personally find it

13    offensive.  I think it is murder.

14              THE COURT:  Well, she shouldn't have been coming

15    through the window.

16              MS. STEWART:  She was jumping up and down asking for

17    help after the police --

18              THE COURT:  You should not have been -- you cannot

19    convince me that somehow what she was doing was somehow

20    justified and the police did not have a justification for

21    taking the actions that they took.  You can't convince me of

22    that.

23              MS. STEWART:  Okay.  All right.  Well, then we won't

24    try.

25              Your Honor, but he wasn't there.  What he is saying
```

```
 1    is he doesn't like that.  He has a different view.  Many people
 2    have a different view.  Her mother has a different view.  I am
 3    not sure if her mother is still here today.
 4              THE DEFENDANT:  She stepped out.
 5              MS. STEWART:  She stepped out.
 6              THE DEFENDANT:  Probably because he pissed her off.
 7              MS. STEWART:  Because she supports people who did
 8    nothing violent and in memory of her daughter comes to many of
 9    the court proceedings.
10              So, Your Honor, I ask for your graciousness in this.
11    He doesn't condone any violence.  He has never committed a
12    violent act.  He answers questions as asked.  So --
13              THE COURT:  Okay.  I heard all of this.  I will think
14    about it overnight.
15              MS. STEWART:  All right.
16              THE COURT:  We'll reconvene at 1:30 tomorrow and I
17    will decide what is the appropriate thing to do.
18              THE DEFENDANT:  Thank you, Your Honor.
19              THE COURTROOM DEPUTY:  All rise.  This Honorable
20    Court is adjourned for the day.
21              (Proceedings concluded at 4:54 p.m.)
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3          I, SHERRY LINDSAY, Official Court Reporter, certify

 4     that the foregoing constitutes a true and correct transcript of

 5     the record of proceedings in the above-entitled matter.

 6

 7

 8

 9

10                    Dated this 16th day of June, 2023.

11

12                    _____
                      Sherry Lindsay, RPR
13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT 2

```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2


3     UNITED STATES OF AMERICA,
                                          Criminal Action
4              Plaintiff,                 No. 1:  21-153

5         vs.                             Washington, DC
                                          June 6, 2023
6     DANIEL GOODWYN,
                                          2:00 p.m.
7              Defendant.
      _____/
8


9                   TRANSCRIPT OF SENTENCING
            BEFORE THE HONORABLE REGGIE B. WALTON
10               UNITED STATES DISTRICT JUDGE


11
      APPEARANCES:
12
      For the Plaintiff:       ANDREW HAAG
13                             USAO
                               Criminal Division
14                             601 D Street NW
                               Washington, DC 20530
15


16    For the Defendant:       Carolyn Stewart
                               1204 Swilley Road
17                             Plant City, FL 33567


18


19


20


21


22    Court Reporter:          SHERRY LINDSAY
                               Official Court Reporter
23                             U.S. District & Bankruptcy Courts
                               333 Constitution Avenue, NW
                               Room 6710
24                             Washington, DC 20001


25
```

1                     P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  This is criminal matter

3    21-153, United States of America versus Daniel Goodwyn.  On

4    behalf of probation, we have Jessica Reichler.

5          May I have counsel approach the lectern and state

6    your appearance, beginning with the government.

7          MR. HAAG:  Good afternoon, Your Honor, Andrew Haag

8    for the United States.

9          THE COURT:  Good afternoon.

10          MS. STEWART:  Good afternoon, Your Honor.  Carolyn

11    Stewart for Daniel Goodwyn.

12          THE COURT:  Good afternoon.  Okay.  I took this

13    matter under consideration and gave a considerable amount of

14    thought on what was the appropriate thing to do in this case

15    and, ultimately, had to look at what occurred here and assess

16    what the appropriate sanction should be.  And first of all, the

17    defendant, as unfortunately as so many other of our fellow

18    Americans has accepted the false impression based upon

19    information that has been disseminated about the 2020

20    presidential election that somehow it was stolen.  And there is

21    just no proof whatsoever that that was, in fact, the case.  To

22    the extent that there may be some or may have been some

23    irregularities in the electoral process, there has been no

24    indication that those irregularities had any impact on the

25    ultimate outcome of the election.

1    There have been over 60 lawsuits that were brought

2    seeking to challenge the electoral result.  None of them have

3    been successful.  And judges from all aspects of the bench have

4    made that conclusion.  And as with so many other Americans, the

5    defendant accepted the false conclusion that the election had

6    been somehow stolen.  And there is no evidence that I have

7    heard that establishes a nexus between him having reached that

8    conclusion and his problem or situation with autism.

9    The defendant with the intention to protest the

10   election results, traveled all of the way across the country to

11   come here as he had a right to do.  And it is the American way

12   to protest peacefully, when protest is thought to be

13   appropriate.  But here, the protest became more than just the

14   peaceful protest in opposition to something that the American

15   citizenry -- at least some disapprove with.  While I can't say

16   to what extent the defendant is associated with the Proud Boys,

17   he clearly online did make statements indicating an association

18   with them and that he made the same statement that the former

19   president made when referencing the Proud Boys indicating stand

20   back and stand by.

21   And, again, there is no evidence that I have heard

22   regarding his autism that would establish a nexus between him

23   having made that statement and the autism from which he

24   suffers.  And he, after listening to apparently the former

25   president make his statements at his rally -- he then comes

1    down to the vicinity of the Capitol with a bullhorn.  He then

2    is exulting other rioters to find their way into the Capitol.

3         And counsel represents that he needs a clear

4    indication of something in order for him to appreciate what is

5    being expected or what is being denied.  And here, according to

6    the evidence that the government showed when he was on the

7    bullhorn, he made statements to the effect that a critical mass

8    was needed in order to accomplish the objective of impeding the

9    certification of the presidential election at a time when it

10   seems clear to me that he would have seen a larger number of

11   police officers who were, in fact, impeding the ability of

12   people to gain access to the Capitol.  And that statement, it

13   seems to me, is inconsistent with the suggestion that he had no

14   appreciation that he and others who were a part of the group

15   were not welcome inside of the Capitol.

16        And, again, there is nothing that would indicate that

17   his autism impacted on his perception in that regard.  The

18   defendant after he entered a plea of guilty, within several

19   months, then appears on the Tucker Carlson show.  And,

20   unfortunately, Mr. Carlson has been a lightning rod and he has

21   said and done things that I think clearly have been divisive.

22   And he, obviously, had an objective in the show that he had

23   when the defendant appeared on that show.  And that was to give

24   the impression that individuals who have been charged in

25   reference to the events on January 6th of '21 have been treated

```
1    unfairly.  And I see no evidence that, in fact, was the case.

2              But he sought to try and minimize, not only the

3    conduct of the defendant, but the conduct of others who have

4    been prosecuted as a result of what took place on that day.

5    And counsel suggests that the defendant did not have the

6    opportunity to correct the record.  But he made no attempt to

7    correct the record.  And when Carlson suggested that all the

8    defendant did was go into the Capitol and walk around for less

9    than a minute and leave, that just wasn't correct.

10             And that misinformation that is disseminated to the

11   American public has contributed to the discord that now exists

12   in our country in reference to the presidential election and

13   what occurred on January 6th.  And there are people who are

14   proclaiming that the individuals who have been prosecuted, who

15   are being detained as a result of that are being held as

16   political prisoners.  And there is just nothing that supports

17   that proposition.

18             But, nonetheless, it is something that parts of the

19   media have sought to portray.  And as a result of that have, in

20   fact, continued to stir up the anger that people have resulting

21   from the misinformation that has been disseminated to the

22   American public about the events that took place on January 6th

23   of '21.

24             And the defendant did not mention the fact that he

25   was on the bullhorn encouraging people to breach the Capitol,
```

 1   which clearly he did when he made his statements.  And he did

 2   not relate the fact that when he got to the door.  And it was

 3   clear to me from the evidence that the government submitted,

 4   the videos, that when he was at the door, it is clear,

 5   considering what took place immediately thereafter, that the

 6   police officer who had directed his attention to the defendant,

 7   for whatever reason, was saying to the defendant that he could

 8   not enter the Capitol.  Because as soon as the defendant

 9   entered the Capitol, the officer went immediately after him

10   having previously been in contact with him and sought to try

11   and -- the evidence would show have him leave the Capitol.

12           The defendant sought to avoid him.  And then when the

13   officer came back in contact with him, again, the defendant had

14   the audacity to call the officer an oath breaker, which clearly

15   was, in my view, an inappropriate statement to make to a police

16   officer who was doing nothing other than carrying out his

17   official duties to protect the Capitol and to protect those at

18   the Capitol he has an obligation to protect.  And, again, there

19   is just no evidence whatsoever in the record that would suggest

20   that the defendant's autism caused him to either get on the

21   bullhorn and say the things that he did or to make that

22   inappropriate statement to that police officer.

23           And all of that, obviously, causes me very

24   significant concern, because the argument that has been made is

25   that his autism should be reason for the Court to basically

1    overlook what he did and not impose any punishment as a result
2    of the conduct that he engaged in.  And, again, there is just
3    no evidence that would support that was the case.  And the
4    defendant, even as of yesterday, still points out his concern
5    about allegedly individuals who were purportedly assaulted by
6    the police, and according to him, have died as a result of
7    those encounters.

8            I have seen no evidence that would indicate to me --
9    and I have seen hours and hours of the videos of what took
10   place that day.  I have seen nothing that would indicate that
11   the police did anything that would indicate they were acting
12   excessively.  The police were under assault.  Several police
13   officers, because of the violent nature of what they
14   experienced have committed suicide, another officer who died as
15   a result of the trauma he experienced as a result of that.

16           And the defendant's concern has been in reference to
17   these individuals who allegedly had a demise as a result of
18   their encounter with law enforcement.  Well, those individuals
19   put themselves in that position.  All the officers were doing
20   was carrying out their official duty trying to protect the
21   Capitol from those individuals.  So to the extent that there
22   were, in fact, individuals who were injured who allegedly died
23   as a result of their injuries -- which I don't know about other
24   than Ms. Babbitt, who is the only person I am familiar with who
25   suffered injuries and died as a result of that.  Again, he

1    associates himself with these individuals who were engaged in

2    wrongdoing as compared to the officers who were merely

3    performing their official duty.

4         And, again, that would suggest to me that despite

5    counsel's representations about him being contrite about what

6    he did and his representations about that, that just rings

7    hollow considering those sympathies that he has towards those

8    who created the problem as compared to those who were

9    performing their official duty.

10        And all of that -- and, again, there is nothing that

11   I have heard in the evidence that has been presented to me that

12   shows a nexus between his autism and his perspective about

13   these individuals and their alleged injuries and demise as

14   compared to what happened to the police officers.

15        So having reached all of those conclusions, I just

16   don't see how I can conclude that he should be treated any

17   differently because of his autism as compared to other

18   individuals who engage in similar conduct.  And I deemed it

19   appropriate on several occasions to impose something less than

20   a prison sentence on individuals who merely went into the

21   Capitol, did not do any damage to the Capitol and did not

22   engage in assaultive behavior.  Under those circumstances, I

23   thought that while I don't in any way condone what they did

24   because they contributed to the mob mentality that resulted in

25   what occurred on January 6th, I nonetheless felt under those

1   circumstances those individuals were entitled to a probationary

2   sentence as compared to a period of detention.  For those

3   individuals who have done more, I felt that that wasn't

4   appropriate.  And that includes not only what occurred on that

5   day, but things that they did thereafter.

6          And, clearly, one of the problems that we are

7   suffering as a country as it relates to the 2020 election and

8   the events that occurred on January 6th is this information

9   that continues to be disseminated to the American public.  And

10  as a result of that, is creating the dissension that exists in

11  America and that is just not good for the future of our

12  country.

13         And the defendant contributed to that by what he did

14  and what he said and didn't do when he appeared on the Tucker

15  Carlson show, because that misinformation that he contributed

16  to, in my view, contributes to what we are still experiencing

17  as a result of what occurred on January 6th of 2021.  And

18  absent, again, my conclusion that anything has been shown that

19  his autism should cause him to be treated differently than

20  other individuals, it is my conclusion that a period of

21  detention is therefore appropriate.

22         And then, obviously, the question becomes what is the

23  appropriate amount of time.  He has already apparently served

24  21 days.  And he should be given credit, obviously, for that.

25  But it is my conclusion that a period of detention for

1    punishment purposes, which is an appropriate factor to consider

2    is appropriate.  Also I think it is important that deterrence,

3    both specific and general, be a part of any sentence.  And I

4    would hope that individuals in the future would appreciate that

5    if they are going to engage in the type of inappropriate

6    behavior that occurred on January 6th that there are going to

7    be consequences.  And those consequences are going to result in

8    their freedom being denied, at least for some period of time,

9    with the hope that will cause individuals not to engage in this

10   type of behavior again.  And will send a message to others

11   discouraging them from engaging in such behavior.

12        I don't know if there is anything -- there would not

13   appear to be anything that would need to be done to provide him

14   with the skills and the coping mechanisms to not involve

15   himself in anything of this nature.  But I don't know if that

16   is true or not.  But I don't think that is really a significant

17   factor to consider.  Considering the types of sentences

18   available to me -- obviously, there are a lot of different

19   options.  But it has been my position in these cases and the

20   seriousness of these cases and what it has done to our country

21   that a sentence of something less than detention, absent those

22   situations that I explained earlier where someone just went

23   into the Capitol and did not do any damage and did not assault

24   individuals, that those alternative sentences are not an

25   appropriate sentence to impose in this case.  And I have

1    considered other individuals who have engaged in similar

2    conduct and what type of sentence they have received to avoid

3    not giving a sentence that is inappropriate -- different from

4    sentences given to other individuals who engaged in similar

5    conduct.  It is my view, again, that a period of detention is

6    appropriate.  And I would conclude that defendant should be

7    detained for a period of 60 days with credit for any time he

8    has already served.

9          I also would require he serve on supervised release

10   for a period of one year.  And that while he is on supervised

11   release, he cannot be rearrested for any reason whatsoever.

12   While he is on release for any offense, he also must fully

13   cooperate with his probation officer, which means he has to

14   meet with that person each and every time he is told to.  Also

15   there is no indication of drug use, but he cannot possess or

16   use illegal drugs.  He will have to be tested as required at

17   least once within 16 days of his release from his jail sentence

18   to see if he is using drugs.  And he also has to provide a

19   sample of his DNA so see if he is involved in further crime

20   that can be used to identify him.

21         I would, consistent with the parties' agreement,

22   require that he pay $500 in restitution.  The probation

23   department has done an assessment of his financial situation.

24   And while I in no way condone the fundraising that he engaged

25   in, it appears that he does not have the money to pay the fine.

1   And, therefore, I would impose a fine, but not the amount that

2   is being requested.  I would impose a fine in the amount of

3   $2,500.

4        Also, I would require that he participate in mental

5   health treatment, if that is deemed to be necessary and that he

6   remain in that treatment until it is no longer felt to be

7   necessary by the probation department.  Also until he has

8   satisfied his financial obligations to the Court that he

9   provide any financial information to the probation office that

10  is requested and that he not create any new financial

11  obligations by way of credit obligations until those amounts

12  are paid or he gets authorization to do that from the probation

13  department.

14        I also would impose a restriction that he not possess

15  any firearms or any other dangerous weapons while he is on

16  supervised release and that he maintain employment, if he is

17  able to do so while he is under supervision.

18        And since he has used social media in order to

19  provide what I consider to be disinformation about this

20  situation, I would require that he permit his computer use to

21  be subject to monitoring and inspection by the probation

22  department to see if he is, in fact, disseminating information

23  of the nature that relates to the events that resulted in what

24  occurred on January 6th of 2021.

25        The restitution is to be paid to the Architect of the

1    Capitol.  And those payments are to be made to the Court.  And

2    the Clerk's Office will then forward that money to the

3    architect.  I will also authorize the release of the

4    presentence report to the appropriate entities who need it in

5    order to carry out the orders of the Court.

6            The defendant does have a right to appeal his

7    conviction and his sentence to the Court of Appeals.  If he

8    cannot afford to pay for a lawyer to represent him on appeal or

9    if he cannot afford to pay for the papers to be filed with that

10   Court to let the Court know he wants to appeal, those expenses

11   will be paid free of charge by the government.

12           Probation, anything else?

13           MS. REICHLER:  Nothing additional at this time, Your

14   Honor.  Thank you.

15           THE COURT:  Anything else from the government?

16           MR. HAAG:  Your Honor, at this time, the defendant

17   having been sentenced, the government moves to dismiss the

18   remaining four counts of the indictment.

19           THE COURT:  Very well.  That motion is granted.

20           Anything else from the defense?

21           MS. STEWART:  Yes, Your Honor.  Since you have

22   determined that he should have --

23           THE COURT:  I will permit him to self report.

24           MS. STEWART:  Excuse me, sir?

25           THE COURT:  I will permit him to self report to the

```
 1    facility where he is designated to serve his jail sentence.

 2              MS. STEWART:  All right.  So self reporting.  And

 3    also I would ask that you notate to the Bureau of Prisons his

 4    request for minimum security, which would be a prison camp at

 5    Bastrop, Texas, B-A-S-T-R-O-P.  And if that is not available,

 6    second choice of El Reno; E-L, second word, R-E-N-O.  That is

 7    in Oklahoma and also a minimum security camp.  But the request

 8    is for minimum security imprisonment, Your Honor.

 9              THE COURT:  I will recommend that he be permitted to

10    serve a sentence at a location as close to his family as

11    possible.  But I will leave it to the Bureau of Prisons to make

12    an assessment as to what his level of detention should be.

13              MS. STEWART:  Your Honor, in other cases it is

14    allowable.  I request here that at least we be allowed to enter

15    that his request is for minimum security.  It has happened in

16    other cases that the judge enters the minimum security request,

17    noted by the defendant.  The Bureau of Prisons doesn't have to

18    listen to us.  We understand that.

19              THE COURT:  Very well.  I will recommend that he be

20    held and detained at a minimum security facility.

21              MS. STEWART:  Thank you, Your Honor.

22              (Proceedings concluded at 2:23 p.m.)

23

24

25
```

```
1                  C E R T I F I C A T E

2

3          I, SHERRY LINDSAY, Official Court Reporter, certify

4     that the foregoing constitutes a true and correct transcript of

5     the record of proceedings in the above-entitled matter.

6

7

8

9

10                         Dated this 14th day of June, 2023.

11

12                         _____
                           Sherry Lindsay, RPR
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```