# EXHIBIT 1

BARRY LOUDERMILK, GEORGIA
CHAIRMAN

H. MORGAN GRIFFITH, VIRGINIA
GREGORY F. MURPHY, NORTH CAROLINA
ANTHONY D'ESPOSITO, NEW YORK

BRYAN STEIL, WISCONSIN
FULL COMMITTEE
CHAIRMAN

One Hundred Eighteenth
# Congress of the United States
House of Representatives

NORMA J. TORRES, CALIFORNIA
RANKING MINORITY MEMBER

DEREK KILMER, WASHINGTON

JOSEPH D. MORELLE, NEW YORK
FULL COMMITTEE
RANKING MINORITY MEMBER

SUBCOMMITTEE ON OVERSIGHT
COMMITTEE ON HOUSE ADMINISTRATION
1309 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–6157
CHA.HOUSE.GOV

November 20, 2024

Chief J. Thomas Manger
Chief of Police
United States Capitol Police
119 D St. NE
Washington, DC 20515

Chief Manger:

I write to you today in my capacity as Chairman of the Committee on House Administration Subcommittee on Oversight ("Subcommittee") to better understand the promotion process and factors considered for promotion at the United States Capitol Police ("USCP"). As Chairman of the Subcommittee, I have jurisdiction over the safety and security of the United States Capitol. Rule X of the Rules of House of Representatives of the 118th Congress grants the Committee on House Administration jurisdiction over "services to the House" which includes the "administration of the House Office Buildings and of the House wing of the Capitol."[1] Additionally, according to Rule 17 of the Rules of the Committee, the Subcommittee is given explicit jurisdiction over the Committee's "matters relating to congressional security."[2] As such, the Subcommittee is responsible for ensuring that USCP has the resources needed to effectively provide for the safety and security of the Capitol and that USCP operates in a manner to successfully accomplish its mission. After the events of January 6, 2021, it was clear that USCP required significant operational changes to ensure the security and safety of the U.S. Capitol Complex, Members, staff, and visitors.

As a Legislative Branch entity, the Subcommittee has a more direct oversight responsibility with USCP than with executive branch law enforcement entities. Nonetheless, Congress should not play a direct role in the operations and security decisions at USCP. However, it is appropriate for this Subcommittee to review decisions made by USCP. The Subcommittee is aware that the USCP recently promoted Michael Byrd from Lieutenant to Captain.[3] I have concerns about this decision given Byrd's lengthy disciplinary history and the apparent political influence of internal operational decisions related to Byrd following January 6, 2021. While I recognize that many of the concerning incidents related to Captain Byrd occurred before you became Chief of Police, Captain Byrd did receive significant favorable treatment by USCP after you became Chief of Police in 2021.

The Subcommittee has learned that Captain Byrd was referred to the USCP Office of Professional Responsibility ("OPR") in 2004 for an incident in Prince George's County, Maryland in which, then-Sergeant Byrd, discharged his service weapon at a fleeing vehicle.[4] On April 5, 2004, Byrd and his wife were awoken at their home by a "loud banging noise" coming from outside their residence. According to Byrd, he observed two

---

[1] Rule X, Rules of the U.S. House of Representatives for the 118th Congress; Paragraph (c)(2)
[2] Rule 17, Rules of the Committee on House Administration for the 118th Congress.
[3] Chris Marquette, *Capitol Police promotes officers who got Jan. 6 attack spotlight*, Roll Call, Aug. 24, 2023.
[4] UNITED STATES CAPITOL POLICE INTERNAL AFFAIRS DIVISION, REP. OF INVESTIGATION NO. 04-044, USE OF FORCE/USE OF WEAPON (Nov. 26, 2004). (on file with U.S. Capitol Police).

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 2 of 7

vans parked outside his neighbor's house. Byrd then retrieved his USCP credentials and service weapon and went outside to investigate further.

According to Byrd, the first van accelerated toward him in an apparent attempt to hit him. Byrd claimed he shouted "stop" and fired two rounds at the *oncoming* vehicle. According to the OPR investigation, Byrd's neighbor who was also present said he was in the line of fire when Byrd discharged his service weapon. Byrd claimed that after firing at the oncoming vehicle, he jumped out of the way but that the second vehicle then drove toward Byrd in another attempt to hit him. According to Byrd, he then fired a single round into the driver's side windshield and then jumped out of the way.

After this encounter, Prince George's County Police found both vans and conducted a search of the vehicles. According to Prince George's County Police, there were no bullet holes in either van's windshield. Police did find, however, a bullet hole near the gas cap of the second van. Police determined that the bullet entered the van from a "rear angle," indicating the van was *shot at from behind*. One of the investigating officers observed that, "based on where [the bullet was found]…where's the threat, because it [was] in the driver's side rear quarter panel."

OPR noted that "based on the location of the shell casings and the angle that Sergeant Byrd alleged he discharged his service weapon," Byrd's testimony that he fired at the vans as they attempted to hit him was "inaccurate." OPR concluded that the evidence suggests Byrd "discharged his service weapon at the vans after they passed him by." Despite this, USCP noted that the investigation found insufficient evidence to determine Byrd violated USCP's Truthfulness policy.[5]

At the conclusion of the investigation, OPR determined that Byrd violated USCP's Use of Force Policy and Use of Weapon Policy by discharging his weapon in a "careless and imprudent manner."[6] Specifically, OPR concluded that Byrd improperly discharged his service weapon while his neighbor was in the line of fire and after both stolen vehicles had passed by him. OPR also noted that the Maryland state prosecutor assigned to the incident determined Byrd used "bad judgement" in his actions responding to the carjacking. Additionally, following OPR's review, Inspector Yancey Garner sent a memorandum to Chief Terrance Gainer concurring with OPR's findings.[7] Despite both OPR and Inspector Garner concluding Byrd violated USCP policy, an appeal to the Disciplinary Review Board subsequently overruled OPR's findings and ruled that Byrd did not violate USCP policy.[8] As a result, this incident is reflected as "not sustained" on Byrd's OPR record.

In 2015, then-Lieutenant Byrd was referred to OPR for an incident involving a verbal altercation at a high school football game in Montgomery County, Maryland.[9] Montgomery County Police Department ("MCPD") assigned at least two officers to provide security, prevent spectators from walking onto the field, and ensure visitors remained in the stands. Shortly after the start of the game, Byrd approached one of the officers and asked if there was another officer stationed on the other side of the field stopping spectators from walking onto

[5] UNITED STATES CAPITOL POLICE INTERNAL AFFAIRS DIV., REP. OF INVESTIGATION NO. 04-044, USE OF FORCE/USE OF WEAPON (Nov. 26, 2004). (on file with U.S. Capitol Police).
[6] *Id.*
[7] Memorandum from Inspector Yancey Garner to Chief Terrance Gainer, IAD Case 04-044 (Dec. 28, 2004). (on file with U.S. Capitol Police).
[8] UNITED STATES CAPITOL POLICE DISCIPLINARY REVIEW BOARD, FINDINGS AND RECOMMENDATIONS NO. CP-535B (May 19, 2005). (on file with U.S. Capitol Police).
[9] UNITED STATES CAPITOL POLICE OFF. OF PROF. RESP., REP. OF INVESTIGATION NO. 15-135, CATEGORY C-DETRIMENTAL CONDUCT: RULE C1: CONDUCT UNBECOMING (Nov. 4, 2015). (on file with U.S. Capitol Police).

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 3 of 7

the field. After the officer informed Byrd of his responsibility to keep spectators off the track, Byrd reportedly became argumentative with the officer and began yelling profanities at the officer, calling him a "a piece of shit, asshole, and racist." Byrd then accused the officer of targeting the "black side" of the field and then "jumped the fence, came onto the track, and [confronted the officer]." Around this time, another MCPD officer heard Byrd yelling at his partner, approached Byrd, and attempted to deescalate the situation. Even after separating from the officer, Byrd continued to scream obscenities. After Byrd calmed down, he spoke to the MCPD officer's partner, identified himself as a Lieutenant with Capitol Police, and gave the officer his business card.

Based on statements received from Byrd and the two MCPD officers on scene, OPR determined that Byrd called one of the officers a "racist asshole" and repeatedly used "vulgar" and "abusive language." OPR found Byrd's charge of Conduct Unbecoming to be sustained, and as a result, he was suspended for seven days without pay.[10]

In 2019, then-Lieutenant Byrd was referred to OPR for leaving his loaded service weapon in a bathroom in the Capitol Visitor's Center.[11] At the time, then-Lt. Byrd was the commander of the House Chambers section of USCP, responsible for ensuring the House Chamber was adequately patrolled. Then-Lieutenant Byrd's weapon was left unattended in a public restroom for approximately 55 minutes before it was discovered by another officer.[12] After OPR's finding that sustained the charge for violating "Compliance with Directives" and "Issued Weapons and Ammunition," Byrd was suspended for 33 days without pay.[13]

USCP records indicate three additional USCP OPR referrals against Byrd; however, the records related to these investigations are reportedly missing.[14] This is disappointing, as the inability to locate these documents hinders the Subcommittee from fulfilling its responsibility to conduct comprehensive oversight over the USCP.

In addition to USCP's decision to promote Byrd despite his disciplinary history, I also have concerns about the decisions USCP made with respect to Byrd after January 6, 2021.

For example, following January 6, 2021, the USCP provided Byrd with an unrestricted $36,000 bonus as part of a retention agreement in August 2021.[15] It is unclear if Byrd ever signed the retention agreement. USCP offered all other officers – including those who suffered physical injuries on January 6 – significantly smaller retention bonuses. A USCP bulletin obtained by the Subcommittee indicates that around the same time that Byrd received his retention bonus, other officers were offered only $3,000.[16] In June 2022, almost a year after Byrd received his retention bonus, USCP offered officers an additional $8,000 retention bonus.[17] It is unclear whether Byrd also received these bonuses.

---

[10] UNITED STATES CAPITOL POLICE OFF. OF PROF. RESP., REP. OF INVESTIGATION NO. 15-135, CATEGORY C-DETRIMENTAL CONDUCT: RULE C1: CONDUCT UNBECOMING (Nov. 4, 2015). (on file with U.S. Capitol Police).

[11] UNITED STATES CAPITOL POLICE OFF. OF PROF. RESP., REP. OF INVESTIGATION NO. 19-076, COMPLIANCE WITH DIRECTIVES, SPECIFICALLY, ISSUED WEAPONS AND AMMUNITION (Apr. 3, 2019). (on file with U.S. Capitol Police).

[12] Katherine Tully-McManus, *Capitol Police weapon left unattended in Capitol bathroom, again*, Roll Call, Feb. 27, 2019.

[13] UNITED STATES CAPITOL POLICE OFF. OF PROF. RESP., REP. OF INVESTIGATION NO. 19-076, COMPLIANCE WITH DIRECTIVES, SPECIFICALLY, ISSUED WEAPONS AND AMMUNITION (Apr. 3, 2019). (on file with U.S. Capitol Police).

[14] E-mail from U.S. Capitol Police to the Subcomm. (Jan. 30, 2024, 07:53 EST). (on file with the Subcommittee).

[15] Memorandum from the United States Capitol Police Off. of General Counsel to the Majority Staff of the H. Comm. on H. Admin. (Sept. 23, 2021). (on file with Subcommittee).

[16] Tom Jackman, *Capitol Police see sharp increase in threats to Congress, departure of dozens of officers*, The Washington Post (Jan. 3, 2022).

[17] Lauren Burke, *'Medium level of paranoia': security concerns still loom on Capitol Hill*, The Guardian (June 25, 2022).

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 4 of 7

USCP also planned to use the Memorial Fund to pay for Byrd's expenses, including any lost overtime, resulting from him missing work following January 6.[18] The Memorial Fund is a fund for officers injured or killed in the line of duty. According to internal USCP documents, USCP planned to submit Byrd's Memorial Fund proposal ahead of any other Memorial Fund payment, including ahead of 90 injured officers.[19]

Additionally, USCP helped Byrd set up a GoFundMe in November 2021, which raised over $164,000 for Byrd.[20] USCP ultimately decided not to formally propose a payment to Byrd from the Memorial Fund after his GoFundMe raised significantly more money than Byrd would have received from the Memorial Fund.

USCP also spent over $21,000 on security upgrades on Byrd's personal home.[21] In addition, starting in July 2021, USCP provided Byrd with a total of six months of housing at local hotels and the Distinguished Visitors Quarters at Joint Base Andrews.[22] During this time, Byrd also had a USCP Dignitary Protection Detail ("DPD") when he left the secure base.[23] On at least one occasion in September 2021, Byrd's DPD detail escorted him to a cigar lounge where he stayed out until 1:30 a.m., necessitating "extended DPD coverage."[24]

Additionally, USCP instructed Byrd *not* to sit for a Fitness for Duty Evaluation following January 6, 2021. USCP was concerned that Byrd may fail the Fitness for Duty evaluation and that, if Byrd failed, he would not be permitted to carry his service weapon. However, even though USCP was concerned Byrd may fail his Fitness for Duty Evaluation, USCP thought it was more important for Byrd to have his USCP weapon for personal protection.[25]

In September 2021, Byrd attempted to personally purchase a shotgun but failed to pass the background check required by federal law. Byrd subsequently sought USCP's help in resolving the issue with his background check.[26] After learning that Byrd failed his background check, USCP took steps to provide him with a USCP-issued shotgun and intended to "lend" him a shotgun even if his background check "did not come through."[27] Ultimately, Byrd failed his shotgun proficiency and was not provided a USCP-issued shotgun.

Shortly after January 6, USCP placed Byrd on Administrative Leave and ultimately removed him from Administrative Leave at the end of June 2021.[28] Byrd signed a telework agreement in July 2021, which allowed him to telework five days a week, but he did not return to work.[29] Despite this, Byrd was not disciplined. Instead, USCP retroactively provided Byrd with Administrative Leave for the days he refused to work in July and August of 2021. USCP then encouraged officers to donate their Annual Leave to Byrd in an internal

---

[18] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (Aug. 11, 2021). (on file with Subcommittee).
[19] *Id*.
[20] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (May 3, 2022). (on file with Subcommittee).
[21] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (Nov. 18, 2021). (on file with Subcommittee).
[22] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (Sept. 23, 2021). (on file with Subcommittee).
[23] *Id*.
[24] *Id.*
[25] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (Nov. 18, 2021). (on file with Subcommittee).
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] Memorandum from the United States Capitol Police Off. Of General Counsel to the Majority Staff of the H. Comm. On H. Admin. (Aug. 11, 2021). (on file with Subcommittee).

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 5 of 7

bulletin. Byrd did not return to work until December 2021, months after he signed the telework agreement and nearly a year after January 6, yet he was never referred to OPR or disciplined.

Based on the above information, it appears USCP treated Byrd more favorably than other officers. However, it is unclear why USCP took these actions. This Subcommittee is dedicated to ensuring USCP has autonomy from political pressures so it can make operational and personnel decisions that are in the best interest of the USCP and the Capitol community. However, based on the information obtained by the Subcommittee regarding USCP's handling of Captain Byrd following January 6, 2021, and his significant disciplinary history, I have concerns about USCP's decision to promote him to the rank of Captain.

Therefore, to assist in our oversight and ensure USCP's apolitical role, I request that USCP respond to the following questions or document requests:
- What is the USCP process for promotion to Captain? Is there a written policy? If so, please provide a copy of that policy.
  - What consideration is given to previous OPR findings when an officer is considered for promotion?
  - Are previous Captain exam scores considered when reviewing candidates?
- With respect to the promotion of Captain Byrd:
  - Who made the decision to promote Byrd?
  - How many total candidates for Captain were there when Byrd was promoted?
  - Where was Byrd ranked with respect to the other candidates for Captain?
  - What was the date of the Captain exam?
  - How many candidates were promoted to Captain at the same time as Byrd?
    - Please provide a list of names and their respective exam scores.
  - Had Byrd previously been considered for promotion to Captain previously?
    - If so, what date was the Captain exam?
    - Please list each date and score for the total number of individuals promoted after each exam. If there was an exam with no subsequent promotions, please explain the reason.
- Please provide copies of all administrative manuals, standard operating procedures, or directives related to USCP's disciplinary process, including but not limited to:
  - A copy of USCP's Rules of Conduct;
  - A copy of USCP's List of Charges;
  - A copy of USCP's Table of Penalties;
- Does USCP have written polices for how penalty assessments are determined? If so, please provide copies including documentation for:
  - Mitigating and aggravating factors regarding severity of penalty assessments;
  - Any other factors taken into consideration in the decision-making process;
- What is USCP's record retention policy with respect to OPR records? Is there a written policy? If so, please provide a copy of that policy.
- Does USCP have a standard operating procedure for initiating an OPR investigation or any other review when a USCP officer discharges their USCP-issued weapon? Is there a written policy? If so, please provide a copy of that policy.
- Does USCP have a standard operating procedure regarding the length of time a USCP employee or officer is placed on Administrative Leave during and after a United States Attorney's Office conducts an investigation into a USCP officer or employee involved shooting? Is there a written policy? If so, please provide a copy of this policy.

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 6 of 7

- o After the United States Attorney's Office makes the decision not to prosecute with respect to an incident, is a USCP officer or employee usually removed from Administrative Leave status and expected to return to work?
- Does USCP have a standard operating procedure regarding the length of time a USCP employee or officer is placed on Administrative Leave during and after an OPR investigation where the employee or officer is not expected to be terminated? Is there a written policy? If so, please provide a copy of this policy.
- Does USCP have a policy related to when officers or employees are required to submit to a Fitness for Duty Evaluation? Is there a written policy? If so, please provide copies of this policy.
  - o After an officer involved shooting, is it standard practice to have an officer submit to a Fitness for Duty Evaluation?
  - o Were any USCP officers required to submit for Fitness for Duty Evaluations following January 6? If so:
    - ▪ How many?
    - ▪ What was their rank?
    - ▪ Why were they required to submit for Fitness for Duty Evaluations?
    - ▪ Were any individuals terminated as a result of a failure to pass a Fitness for Duty Evaluation?
- Did USCP personnel assist Captain Byrd in setting up his GoFundMe following January 6? If so, please describe that assistance and provide all records referencing this assistance.
  - o How many other officers has USCP assisted in setting up a GoFundMe?
- Did Byrd have any conversations directly with Members of Congress related to the benefits or accommodations he personally received from USCP following January 6?
- With respect to the period after January 6:
  - o When was Byrd placed on administrative leave?
  - o When was Byrd taken off of Administrative Leave by USCP?
  - o How many days of Administrative Leave did USCP provide Byrd retroactively?
  - o Why did USCP retroactively provide Byrd with Administrative Leave? Has USCP done this for other officers and if so, how common is this practice at USCP?
  - o When did USCP instruct Byrd to return to work?
  - o When did Byrd return to work?
  - o Did Byrd sign a retention agreement? If so, please provide a copy of the retention agreement.
  - o In July 2021, Byrd signed a telework agreement. How many days did Byrd telework in 2021? Please provide a copy of the final, signed telework agreement.
- Did USCP seek or receive approval from Committees with oversight jurisdiction for the lump sum retention bonus, reimbursing him for his home security costs, or any other considerations USCP provided Byrd? If so, please provide those requests and approvals.
  - o If not, please cite the specific authorities USCP used to issue these benefits to Byrd.

Additionally, please preserve and produce all digital records, including but not limited to emails, text messages, other chat messages, calendars, notes, and files for:

- Captain Michael Byrd's cell phone, email account, computer, or any other electronic device issued by USCP from January 1, 2021, through January 1, 2024;
- Copies of all documents prepared by USCP summarizing actions taken by USCP on behalf of then-Lt. Byrd such as the one attached, dated November 18, 2021. Please also indicate the date such documents were shared, the names of the Members or individuals it was shared with, and any digital records such as emails referencing such documents, including drafting and transmittal.

Letter from Chairman Loudermilk to Chief Manger
November 20, 2024
Page 7 of 7

I appreciate your attention to this matter and request that you respond in writing by December 4, 2024.

Sincerely,

Barry Loudermilk
Chairman
Subcommittee on Oversight
Committee on House Administration